FISCHER, et al, Respondents, v. GORMAN, et al, Appellants.

(274 N. W. 866)

(File No. 8060. Opinion filed September 10, 1937)

*Cherry & Braithwaite* and *B. O. Stordahl,* all of Sioux Falls, for Appellants.

*Danforth & Davenport,* of Sioux Falls, for Respondents.

SMITH, J. This action was brought by the executor of the last will and testament of Esther C. Housman, deceased, and by the devisees and legatees thereunder, to test the validity of certain deeds and assignments of real and personal property located in Sioux Falls, S. D. The instruments of conveyance and assignment were executed by the deceased during her lifetime, and came into the possession of the respective appealing defendants. The central controversy between the parties deals with the delivery of these instruments. Findings, conclusions of law, and decree were entered in favor of plaintiffs. Under the assignments of error we are required to review the sufficiency of the evidence and the adequacy of the findings. A preliminary epitome of the events shown by the evidence will contribute to an understanding of that which follows.

During the life of deceased she was the owner of certain real and personal property. The appealing defendants were her intimate friends and neighbors, but were in no manner related to her and were not named as devisees or legatees in her last will and testament. Some months prior to her death deceased had executed and acknowledged the conveyances in question and had placed the same in respective packets with her savings bank book and other papers, with the name of defendant John Gorman on one packet, and the name of Clarence L. Bruce on the other. A further description of the instruments and of the property involved will serve no useful purpose. These packets were placed in a black handbag of a style formerly used by women. Some months prior to her death, deceased called her maid servant, pointed out the bag where it was hanging in a closet in the house, and directed her to deliver the papers therein contained when she was advised that deceased could not recover. On September 20, 1935, at about 10:30 o'clock in the evening, deceased suffered a paralytic stroke

and passed away at about 12:30 p. m. on September 21st. Witnesses for appellants testify that some time during the morning of the 21st, the maid called Mr. and Mrs. Gorman and Mr. Bruce into the bedroom where the black bag was hanging and handed the packets to Mr. Gorman and Mr. Bruce, respectively, according to her previous instructions.

With reference to the delivery, appellants stoutly assert that the evidence conclusively establishes a present delivery of the instruments in question to a third person for the benefit of the grantees, or, second, a delivery of the instruments to the grantees by an agent of the grantor. It is further asserted by appellants that the court failed to make an effective finding of fact on the issue of delivery.

The first contention made by appellants was predicated upon the transaction between the grantor and the maid at the time the black bag and its contents were pointed out to the maid. The circumstances are described by the maid in the following words, on direct examination: "The first time I saw those papers or knew anything about them was along in the middle of June when Mrs. Housman told me that she had some papers and told me where she had them and she showed me the bag at the time, where they were in the closet, and she said to me, 'When you know that I can't live, or that the nurse says that I am—I can't recover, you deliver these papers that are in the bag'; but I didn't see the papers myself. Mrs. Housman gave me those instructions at that time and showed me this bag which was a bag such as women used to use as a pocket book, and was in the closet in the spare bedroom, which would be on the north wall of that bedroom. I didn't look inside the bag at that time and didn't have the bag in my possession at all. She had the bag herself and just put her hand in on the papers and said she had some papers there in the bag, and she told me that when I knew that she could not recover, or I was so advised by the nurse, to deliver those papers to the persons to whom they were addressed. I did not know at that time to whom they were addressed."

Appellants purport to find authority for their position in Trumbauer et al. v. Rust, 36 S. D. 301, 154 N. W. 801, 4 A. L. R. 10; O'Connor et al. v. McCabe, 46 S. D. 269, 192 N. W. 370;

Stalting et al. v. Stalting et al., 52 S. D. 309, 217 N. W. 386, 389; Wolf v. Wolf et al., 59 S. D. 418, 240 N. W. 349; Merkamp et al. v. Niles et al., 62 S. D. 241, 252 N. W. 636; and in similar holdings from other jurisdictions. We have no difficulty, however, in discerning that these cases are clearly distinguishable from the situation at bar. In each of the cases cited, the third person was placed in control of the instruments of conveyance. The controlling principle was well stated by this court in the case of Stalting v. Stalting, supra, as follows: "We believe the sound rule, and that sustained by the weight of authority, is that, if the grantor unconditionally hands over the deed to the depositary, placing it beyond the control and dominion of the grantor, with instructions to transmit to the grantee at grantor's death, there is then a valid, effective, and irrevocable delivery of the instrument as a deed, and a present interest in the realty passes at that time to the grantee, although the enjoyment thereof is deferred until the death of the grantor. If, however, when the instrument is handed over to the depositary, the grantor retains control and dominion over it, and the instruction is to deliver the deed to the grantee at grantor's death, unless otherwise directed in the meantime, there is no delivery of a deed, but merely an effort to make a will in a manner not recognized by the law; the depositary remains the agent of the grantor only, and his authority to deliver is terminated by the death of the grantor, and the instrument can have no effect, unless it was executed with the formalities required for the execution of a will."

In the instant case, the instruments were never handed to the third person, nor were they placed in the control of the third person. Undeniably, full control of the instruments remained in the grantor. Further, it is clear that there was no intention on the part of the grantor to make any present grant. She was looking to the future, and to the execution of a plan she had in mind to deliver these instrumnts when and if it was certain that she was to die. It is evident that she sensed the necessity of delivery during her lifetime rather than after death as an essential of this plan. In the meantime, it is clear that she intended not only to retain the enjoyment but also the title to the property. The circumstances disclose instructions to an agent of the grantor, and wholly fail to show symbolic, constructive, or actual delivery of the instru-

ments to a third person for the grantees. The essential element, namely, control by a third person, from which the courts have inferred an intention to convey a present interest, is entirely lacking in this record.

The determined status of the maid servant as the agent of the grantor leads us to the consideration of the circumstances under which the instruments of conveyance came into the possession of the appealing grantees, and requires an answer to one specific inquiry, namely: Was the authority of the agent revoked by the death or incapacity of the principal prior to the purported deliveries?

Provision is made for the termination of the agency in case of death or incapacity of the principal, by section 1285 of the Revised Code of 1919, which reads as follows:

"Unless the power of an agent is coupled with an interest in the subject of the agency, it is terminated as to every person having notice thereof, by:

"1. Its revocation by the principal;

"2. His death; or,

"3. His incapacity to contract."

We pursue our inquiries upon the theory of the appellants that the instruments were in fact placed in the possession of the grantees during the morning preceding the death of the deceased, and we center our attention upon the termination of the agency through the incapacity of the principal to contract. As we pursue this inquiry, we need give no thought to the provision contained in section 1285, supra, dealing with a power coupled with an interest, as the agent in question had no such interest.

That a person "entirely without understanding" is without capacity to contract, is provided by section 86, of the Revised Code of 1919. The phrase "entirely without understanding" has never been construed by this court. The identical language, however, was considered by the Supreme Court of California in the early case of Jacks v. Estee, 139 Cal. 507, 73 P. 247, 248. In that case the court said: "Here, obviously, the term 'understanding' is used to denote, not the act of understanding, but the capacity or faculty of doing so; and the expression 'without understanding' is to be

understood as referring to persons without such capacity. Nor is the expression to be understood in its literal and extreme sense, for hardly in any case can even the most insane persons be said to be without some degree of understanding (1 Wharton on Cont. § 98) ; but rather it is to be understood as restricted to the subject-matter to which the section relates—which is that of contracts, executed and executory—and hence as applying to all persons who are entirely without the capacity of understanding or comprehending such transactions."

The identical statute was before the Oklahoma court in the case of Long et al. v. Anderson et al., 77 Okl. 95, 186 P. 944, 946. The court said : "The test to be applied in such circumstances is that the grantor shall have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting, and that in order to invalidate the deed it must be shown that the grantor was incapable of comprehending that the effect of the deed when made, executed, and delivered would be to divest him of the title to the land set forth in the deed."

In the case of Fleming v. Consolidated Motor Sales Co. et al., 74 Mont. 245, 240 P. 376, 381, in construing the identical section the court said: "The phrase 'entirely without understanding,' as used in section 5683, is construed, not as requiring proof of an entire lack of understanding on any subject, i.e., that the mind of the person is an absolute void, but such a degree of mental deficiency as to render him incapable of understanding a transaction of the nature involved."

Such, in our opinion, are the minimum limits of understanding essential to the capacity to contract. It logically follows that an agency for a special purpose can only be sustained so long as the principal retains the faculty of understanding the nature and effect of the transaction involved. In the instant case, the principal must have retained sufficient of her faculties not only to understand the nature of the particular transfers, but also to comprehend that such transfers would divest her of all title to her property, and that such divestiture would remain absolute even though she regained her health. As the evidence is examined, it should be further borne in mind that we are dealing with "understanding," and not with mere "consciousness." "Understanding," as that term is

used in the applicable section, involves more than "consciousness." It suggests the concept of a mind with the faculty of applying its powers of reason to the elements it comprehends, to the end that a judgment or conclusion may be formed.

With this background, we explore the record to ascertain the mental condition of the grantor. While there is conflict in the record on the element of time and as to the persons present, it is established that no manual delivery was made prior to a time during the morning when the patient suffered a sinking spell, and from which point the shadows of death progressively accumulated. Her condition from that point forward is described by the appealing defendants and several other witnesses.

The defendant John Gorman said: "When I got there about eight * * * I went into the room where Mrs. Housman was. I did not talk to her. I looked at her and she saw me. * * * She just nodded. * * * I was in the sun room between an hour and an hour and a half. Sometime in that interval I heard the nurse say Mrs. Housman was sinking. * * * That was before Mrs. Gorman, Mr. Bruce, Miss Wahlstrom and I went into the spare room. * * * Between the time when I saw Mrs. Housman at eight o'clock and the time that Mrs. Gorman, Mr. Bruce and I went into this spare room, I had not seen Mrs. Housman again. * * * I imagine that Mrs. Housman by that time was in a sort of a coma. I didn't see her. As I understood it, from the general talk around, she had sunk, or was sinking."

Mrs. Gorman testified: "In the morning the nurse said she thought she was worse. I can't say exactly the time the nurse said that; but I believe it was before we went into the spare room."

Miss Wahlstrom, the maid servant, said: "* * * I was standing by the bed and Mrs. Housman had been mumbling. It was hard for her to talk, and she mumbled or said 'papers' and went on mumbling, and that is what reminded me of the papers being left. During that night and morning Mrs. Housman was gradually growing weaker, but I don't remember any spells of any kind. Before she mentioned the papers Mr. Bruce was in the room and she looked up at him and said: 'Take good care of yourself and David.' * * * Mr. Bruce did not understand what she had said, but I told him what it was. The left side of her mouth at that time

was paralyzed, and she had taken her teeth out so it was hard to understand her. * * * When she talked about 'papers' I did not understand any more of what she said. It was getting harder to understand her all the time, but she appeared to be trying to tell me something. * * * It was after that that I called Mr. and Mrs. Gorman and Mr. Bruce into the spare room. * * * In the morning Miss Thorson said something about a turn for the worse, and that Mrs. Housman had had a sinking spell and that she was worried about her. That sinking spell came along about eight o'clock the following morning. I could tell by her appearance that there was a change for the worse. Her eyes got kind of set, breathing labored, but she seemed conscious. I know she was conscious because she talked. It was not at eight o'clock that she had that set look in her eyes. It was later. It would be eight thirty or so. * * * From my observation of her that morning I don't know whether she knew or realized what was going on, but part of the time I believe she did. I don't think she realized all that was going on, because she did not realize she was paralyzed."

The defendant Bruce testified about her condition as follows: "Maybe three-quarters of an hour after I got there the Gormans, Miss Wahlstrom and I went into the spare room, or it may have been an hour. There had at that time been a discussion about Mrs. Housman being worse. * * * Mrs. Housman was slowly sinking. She had up and down spells during the morning. I observed that her eyes were set. * * * Later on in the morning the breathing became labored. I had not noticed that before the papers were delivered."

The witness Miss Canfield, who claims to have arrived at the sick room just before 9 o'clock, testified as follows: "At that time I thought Mrs. Housman was in much worse condition than I had expected, and I told the nurse, 'Mrs. Housman's dying,' * * * her eyes never moved again and her breath was labored. The nurse said that about an hour before there was a decided change for the worse. * * * I was not out of the room further than the door leading to the hall and the living room at any time after that until about a quarter to twelve. During that time Mrs. Housman could not have said any coherent word. * * * After the time that I arrived there on the morning of the day of her death, there

was no change in her condition so that she could know or understand anything. * * * When we went into the bedroom she made some incoherent noise, and we thought we got the word 'Edna,' but she did not say anything clearly. She didn't move her lips. I bent over and said, 'This is Gordon and Edna,' and she made some funny sound in her throat, which we thought might have been 'Edna.' After that she never made any more movement or sound, except breathing. Her mouth was open and her lip moved up and down with every breath, and she continued to do that as long as I was there, without much change that I could see."

Miss Jones, who arrived at the sick room with Miss Canfield, testified as follows: "Mrs. Housman was making a terrible sound in her throat, and her eyes were fixed, and she was lying straight on her back with her hands under the covers. * * * She had a terrible death sound in her throat."

Miss Thorson, the nurse in charge, testified as follows: "In the morning there was a change for the worse about nine o'clock, just after I had finished bathing her. Her breathing then was labored. * * * I made some mention to those in the house that there had been a change for the worse. * * * From that time on Mrs. Housman's breathing was labored, and I don't believe she would have known very much of what was going on about her. I think she recognized people. I think she recognized Miss Wahlstrom at one time. I don't know whether she recognized others who came into the room. * * * From the time I tried to call the doctor (just after the sinking spell) I would say she was in a sort of semi-conscious state. * * * I can't remember now of her saying anything that was intelligible after I called the doctor. * * * By semi-conscious condition I meant she was not conscious all the time, but there were times she came to a little, but in that condition her mind was not entirely clear that I could see at the time. * * * She was very quiet all the time after about nine o'clock when her condition changed. I would speak to her and sometimes she seemed to sort of rouse and other times she paid no attention whatever."

A repetition of this testimony is sufficient to indicate that the evidence is sufficient to sustain the finding of the court that the papers were given into the possession of the grantees at a time when Mrs. Housman was without a capacity to contract.

Throughout the discussion on the subject of delivery, appellants lay great stress upon the presumption of delivery which flows from the possession of the grants by the grantees, and upon the further rule placing the burden of proof upon the respondents. The evidence, however, being before the court and being sufficient in itself to support the finding of the court that the grantor was "entirely without understanding" at the time of the manual delivery, it follows that the respondents sustained the burden of proof and that the presumption of delivery was effectively rebutted.

Appellants further contend that the court failed to make a finding on the question of delivery. In its findings the court first found generally: "* * * which papers or instruments were never legally delivered to said Defendants, or any of them, during the lifetime of Esther C. Housman, or at any time when she was mentally competent of making a delivery thereof, or at any time when she was mentally competent of making a contract * * *." Then, after a description of each respective instrument, the court used the following language: "* * * were never legally delivered by the Deceased during her lifetime, or at a time when she was capable of making delivery, or at a time when she was mentally competent to enter into any contract." And then made and entered its specific finding as follows: "* * * and the Court specifically finds that at the time said Defendants gained possession of said papers, the Deceased was either dead, or mentally incompetent to enter into any contract."

Appellants assail this language as constituting conclusions of law and not findings of fact.

It being the duty of this court to interpret the findings in the light of the entire record, and in an effort to support the judgment of the court (64 C. J. p. 1272), we are convinced that the foregoing specific finding of the court constitutes a finding of fact with reference to the ultimate fact of manual delivery, and that it fully supports the ocnclusion of law that the instruments were not delivered. Dodson v. Crocker, 20 S. D. 312, 105 N. W. 929; Slimmer et al. v. Meade County Bank of Sturgis et al., 38 S. D. 311, 161 N. W. 325.

We find it unnecessary to deal with other matters assigned, for the reason that we are of the view that they are only such

matters as may be raised by one who has an interest in the property in question.

The judgment and order of the trial court are affirmed.

ROBERTS, and WARREN, JJ., concur.

RUDOLPH, P. J., and POLLEY, J., did not sit.