FIRST STATE BANK OF SINAI, a South Dakota Banking Corporation, Plaintiff and Appellant,

v.

Mervin HYLAND, Defendant and Appellee.

No. 15276.

Supreme Court of South Dakota.

Argued Oct. 21, 1986.

Decided Jan. 21, 1987.

Jerome B. Lammers of Lammers, Lammers, Kleibacker & Casey, Madison, for plaintiff and appellant.

David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellee.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Plaintiff-appellant First State Bank of Sinai (Bank) sued defendant-appellee Mervin Hyland (Mervin) seeking to hold him responsible for payment on a promissory note which he cosigned. Upon trial to the court, the circuit court entered findings of fact, conclusions of law, and judgment holding Mervin not liable for the note's payment. Bank appeals advocating that the court erred when it ruled that

(1) Mervin was incompetent to transact business when he signed the note;

(2) Mervin's obligation to Bank was void; and

(3) Mervin did not subsequently accept/ratify the obligation.

We treat these issues seriatim. We reverse and remand.

### FACTS

On March 10, 1981, Randy Hyland (Randy) and William Buck (Buck), acting for Bank, executed two promissory notes. One note was for $6,800 and the other note was for $3,000. Both notes became due on September 19, 1981.

The notes remained unpaid on their due date and Bank sent notice to Randy informing him of the delinquencies. On October 20, 1981, Randy came to the Bank and met with Buck. Buck explained to Randy that the notes were past due. Randy requested an extension. Buck agreed, but on the condition that Randy's father, Mervin, act as cosigner. One $9,800 promissory note dated October 20, 1981 (the two notes of $6,800 and $3,000 were combined) was created. Randy was given the note for the purpose of obtaining his father's signature. According to Randy, Mervin signed the note on October 20 or 21, 1981.

Mervin had transacted business with Bank since 1974. Previously, he executed approximately 60 promissory notes with Bank. Mervin was apparently a good customer and paid all of his notes on time. Buck testified that he knew Mervin drank, but that he was unaware of any alcohol-related problems.

Randy returned to the Bank about one week later. Mervin had properly signed the note. In Buck's presence, Randy signed the note, which had an April 20, 1982 due date.

On April 20, 1982, the note was unpaid. Buck notified Randy of the overdue note. On May 5, 1982, Randy appeared at the Bank. He brought a blank check signed by Mervin with which the interest on the note was to be paid. Randy filled in the check amount at the Bank for $899.18 (the amount of interest owing). Randy also requested that the note be extended. Buck agreed, but required Mervin's signature as a prerequisite to any extension. A two-month note for $9,800 with a due date of July 2, 1982, was prepared and given to Randy.

Randy did not secure his father's signature on the two-month note, and Mervin testified that he refused to sign that note. On June 22, 1982, Randy filed for bankruptcy which later resulted in the total discharge of his obligation on the note.

On July 14, 1982, Buck sent a letter to Randy and Mervin informing them of Bank's intention to look to Mervin for the note's payment. On December 19, 1982, Bank filed suit against Mervin, requesting $9,800 principal and interest at the rate of 17% until judgment was entered. Mervin answered on January 14, 1983. His defense hinged upon the assertion that he was incapacitated through the use of liquor when he signed the note. He claimed he had no recollection of the note, did not remember seeing it, discussing it with his son, or signing it.

Randy testified that when he brought the note home to his father, the latter was drunk and in bed. Mervin then rose from his bed, walked into the kitchen, and signed the note. Later, Randy returned to the Bank with the signed note.

The record reveals that Mervin was drinking heavily from late summer through early winter of 1981. During this period, Mervin's wife and son accepted responsibility for managing the farm. Mervin's fami-

ly testified that his bouts with liquor left him weak, unconcerned with regard to family and business matters, uncooperative, and uncommunicative. When Mervin was drinking, he spent most of his time at home, in bed.

Mervin's problems with alcohol have five times resulted in his involuntary commitment to hospitals. Two of those commitments occurred near the period of the October 1981 note. On September 10, 1981, Mervin was involuntarily committed to the Human Services Center at Yankton. He was released on September 19, 1981. On November 20, 1981, he was involuntarily committed to River Park at Pierre.

Between the periods of his commitments, September 19, 1981 until November 20, 1981, Mervin did transact some business himself. On October 3, Mervin and Buck (Bank) executed a two-month promissory note enabling the former to borrow $5,000 for the purchase of livestock. Mervin also paid for farm goods and services with his personal check on September 29, October 1 (purchased cattle at Madison Livestock Auction), October 2, and October 5, 1981. Mervin testified that during October 1981, he had personally hauled his grain to storage elevators and made decisions concerning when grain was sold. Additionally, Mervin continued to operate his automobile, often making trips to purchase liquor.

A trial was held on October 4, 1985. Mervin was found to be entirely without understanding (as a result of alcohol consumption) when he signed the October 20, 1981 promissory note. The court pointed to Mervin's lack of personal care and nonparticipation in family life and farming business as support for finding the contractual relationship between the parties void at its inception. It was further held that Bank had failed to show Mervin's subsequent ratification of the contract. Bank appeals.

## DECISION

### I. AND II.

### MERVIN INCOMPETENT TO TRANSACT BUSINESS? PROMISSORY NOTE VOID?

For ease of treatment, Issues I and II will be treated together. Historically, the void contract concept has been applied to nullify agreements made by mental incompetents who have contracted either entirely without understanding or after a judicial determination of incapacity had been entered. *See Dexter v. Hall,* 82 U.S. (15 Wall.) 9, 21 L.Ed. 73 (1873); SDCL §§ 27A–2–1 and 27A–2–3; 2 S. Williston, *A Treatise on the Law of Contracts,* § 257 (3d ed. 1959 & Supp.1980); Restatement (Second) of Contracts § 12 (1981). Incapacitated intoxicated persons have been treated similarly to mental incompetents in that their contracts will either be void or voidable depending upon the extent of their mental unfitness at the time they contracted. 2 S. Williston, *supra,* at § 260; Restatement (Second) of Contracts § 16. A void contract is without legal effect in that the law neither gives remedy for its breach nor recognizes any duty of performance by a promisor. Restatement (Second) of Contracts § 7, comment a. Therefore, the term "void contract" is a misnomer because if an agreement is void, at its genesis, no contract (void or otherwise) was ever created. *See* J. Calamari & J. Perillo, *The Law of Contracts* § 1–11 (2d ed. 1977).

Mervin had numerous and prolonged problems stemming from his inability to handle alcohol. However, he was not judicially declared incompetent during the note's signing. Therefore, a void contract could only exist if Mervin was "entirely without understanding" (incompetent) when he signed the note.

The phrase "entirely without understanding" has been a subject of this Court's scrutiny from at least 1902. *Mach v. Blanchard,* 15 S.D. 432, 90 N.W. 1042 (1902). It has evolved in the law to apply in those situations where the person contracting did not possess the mental dexterity required to comprehend the nature and ultimate effect of the transaction in which he was involved. *See Fischer v. Gorman,* 65 S.D. 453, 458–60, 274 N.W. 866, 870

(1937) (citing *Jacks v. Estee*, 139 Cal. 507, 73 P. 247 (1903); *Fleming v. Consol. Motor Sales*, 74 Mont. 245, 240 P. 376 (1925); *Long v. Anderson*, 77 Okla. 95, 186 P. 944 (1920)). A party attempting to avoid his contract must carry the burden of proving that he was entirely without understanding when he contracted. *Christensen v. Larson*, 77 N.W.2d 441, 446–47 (N.D.1956); *Hauge v. Bye*, 51 N.D. 848, 855, 201 N.W. 159, 162 (1924); 17 C.J.S. *Contracts* § 133(2) (1963). Lapse of memory, carelessness of person and property, and unreasonableness are not determinative of one's ability to presently enter into an agreement. *Hochgraber v. Balzer*, 66 S.D. 630, 634, 287 N.W. 585, 587 (1939). Neither should a contract be found void because of previous or subsequent incompetence. *Heward v. Sutton*, 75 Nev. 452, 345 P.2d 772 (1959); *Atwood v. Lester*, 20 R.I. 660, 40 A. 866 (1898); 41 Am.Jur.2d *Incompetent Persons* § 69 (1968). Our inquiry must always focus on the person's mental acuity and understanding of the transaction at the time contracting occurred. *See Fischer*, 65 S.D. at 459, 274 N.W. at 869–70; 41 Am. Jur.2d, *supra*, at § 69.

To show that he was entirely without understanding when he signed the note, Mervin points to his family's testimony that he was unconcerned with family and business, uncooperative, antisocial, and unkempt. He also notes his involuntary commitments in the Fall of 1981.

█ Yet, Mervin engaged in farm operations, drove his truck, executed a promissory note (on October 3, 1981, for cattle he bought, which note was paid approximately two months thereafter), and paid for personal items by check drawn on his bank circa the period that he signed the note.

Obviously, Mervin had an understanding to transact business; the corollary is that he was not entirely without understanding. In addition, only Randy was present when his father signed the note, and Randy's testimony (during his deposition and at trial) was vague and inconsistent on the crucial points of Mervin's demeanor when he signed the note and the general circumstances surrounding the event. Randy did, however, testify at his December 9, 1982 bankruptcy hearing that his dad knew he was signing a note. Thirdly, Mervin was not judicially committed during the note's signing and the presumption via SDCL 27A–14–2 [1] must be that his discharge from Yankton on September 19, 1981, was an indication of his improved well-being. We therefore hold that Mervin failed to carry the burden of proving his incompetence (entirely without understanding) when he signed the note and we consequently rule that his obligation to Bank was not void. In so holding, we determine that the findings of fact and conclusions of law are clearly erroneous as we are, based on the entire evidence, left with a definite and firm conviction that a mistake has been committed. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970).[2]

### III.

WAS THERE SUBSEQUENT ACCEPTANCE/RATIFICATION OF THE NOTE? WAS THERE PROMPT RESCISSION OF THE NOTE?

█ Contractual obligations incurred by intoxicated persons may be voidable. *See* 2 S. Williston, *supra*, at § 260. Voidable contracts (contracts other than those entered into following a judicial determina-

---

**1.** SDCL 27A–14–2 provides:

A patient involuntarily committed may be discharged or provisionally discharged when, in the opinion of the administrator of the community mental health center or the center, *the patient's behavior is no longer that which precipitated or caused his admission.* The patient may agree to continue treatment voluntarily. (Emphasis added.)

**2.** The trial court seemed unclear on the state of the law concerning the distinction between void and voidable contracts. In Conclusion of Law II, Mervin's obligation via the promissory note was labeled void. Subsequently, in Conclusion of Law III, the court found that "the Defendant [Mervin] did not by his later actions ratify the void contract." These statements cannot correctly coexist. If the contract was void at its inception, it may not be subsequently ratified; only voidable contracts may be ratified.

tion of incapacity, or entirely without understanding) may be rescinded by the previously disabled party. SDCL 27A–2–2. However, disaffirmance must be prompt, upon the recovery of the intoxicated party's mental abilities, and upon his notice of the agreement, if he had forgotten it. *Hauge v. Bye*, 51 N.D. at 855, 201 N.W. at 162; *Spoonheim v. Spoonheim*, 14 N.D. 380, 389, 104 N.W. 845, 848 (1905); 2 S. Williston, *supra*, at § 260; Restatement (Second) of Contracts § 16, comment c. SDCL 53–11–4 is also relevant and provides that "[t]he party rescinding a contract must rescind promptly, upon discovering the facts which entitle him to rescind...." *See also Kane v. Schnitzler*, 376 N.W.2d 337 (S.D.1985). This Court in *Kane* noted that a delay in rescission which causes prejudice to the other party will extinguish the first party's right to disaffirm. *Id.*, 376 N.W.2d at 340.

▉ A voidable contract may also be ratified by the party who had contracted while disabled. Upon ratification, the contract becomes a fully valid legal obligation. SDCL 53–3–4. Ratification can either be express or implied by conduct. *Bank of Hoven v. Rausch*, 382 N.W.2d 39, 41 (S.D. 1986); 17 C.J.S. *Contracts* § 133 (1963). In addition, failure of a party to disaffirm a contract over a period of time may, by itself, ripen into a ratification, especially if rescission will result in prejudice to the other party. *See Kane*, 376 N.W.2d 337; 2 S. Williston, *supra* at § 260; 17 C.J.S., *supra*, at § 133.

▉ Mervin received both verbal notice from Randy and written notice from Bank on or about April 27, 1982, that the note was overdue. On May 5, 1982, Mervin paid the interest owing with a check which Randy delivered to Bank. This by itself could amount to ratification through conduct. If Mervin wished to avoid the contract, he should have then exercised his right of rescission. We find it impossible to believe that Mervin paid almost $900 in interest without, in his own mind, accepting responsibility for the note. His assertion that paying interest on the note relieved his obligation is equally untenable in light of his numerous past experiences with promissory notes.[3]

In addition, Mervin's failure to rescind, coupled with his apparent ratification, could have jeopardized the Bank's chances of ever receiving payment on the note. As we know, Mervin unquestionably was aware of his obligation in late April 1982. If he had disaffirmed, then, Bank could have actively pursued Randy and possibly collected some part of the debt. By delaying his rescission, and by paying the note's back interest, Mervin lulled Bank into a false sense of security that may have hurt it when on June 22, 1982, Randy filed for bankruptcy and was later fully discharged of his obligation on the note.

We conclude that Mervin's obligation to Bank as not void because he did not show that he was entirely without understanding when he signed the note. Mervin's obligation on the note was voidable and his subsequent failure to disaffirm (lack of rescission) and his payment of interest (ratification) then transformed the voidable contract into one that is fully binding upon him.

We reverse and remand.

MORGAN and SABERS, JJ., and FOSHEIM, Retired Justice, concur.

WUEST, C.J., concurs in result.

MILLER, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

---

**3.** Mervin claims that he paid the interest because he owed Randy money and that this interest payment did not in any way constitute acceptance of the obligation. But Randy testified that his dad neither owed him money nor required that Randy later work off the payment. Moreover, Randy testified that the "interest was due and I didn't have the money so he [Mervin] said he'd just as well pay it." Trial Transcript at 42–43, quoting Randy's Deposition at 12.