#29142-a-JMK
**2020 S.D. 59**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

AQREVA, LLC,                                    Plaintiff and Appellant,

v.

EIDE BAILLY, LLP, LEE BRANDT,
SHELLEY KAMPMANN, AND LJB,
INC., f/k/a MEDICAL PRACTICE
MANAGEMENT, INC.,                               Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CAMELA THEELER
Judge

* * * *

PATRICK L. SEALEY of
Heidman Law Firm
Sioux City, Iowa

THOMAS C. KOESSL
ERIC R. LIFVENDAHL of
L & G Law Group LLP
Chicago, Illinois                               Attorneys for plaintiff and
                                                appellant.

* * * *

CONSIDERED ON BRIEFS
MAY 27, 2020
OPINION FILED **10/28/20**

LISA M. PROSTROLLO of
Redstone Law Firm, LLP
Sioux Falls, South Dakota

BRENT J. EDISON of
Vogel Law Firm
Fargo, North Dakota

Attorneys for defendant and
appellee Eide Bailly, LLP.


TIM R. SHATTUCK,
SANDER J. MOREHEAD of
Woods, Fuller, Shultz & Smith, P.C.
Sioux Falls, South Dakota

Attorneys for defendants and
appellees Brandt, Kampmann &
LJB, Inc.

#29142

KERN, Justice

[¶1.]        After Aqreva, LLC (Aqreva) purchased a medical practice management service from Eide Bailly, LLP (Eide Bailly), Aqreva sued Eide Bailly, Lee Brandt, Shelly Kampmann, and LJB, Inc. (LJB) for breach of contract, alleging they violated non-compete, non-solicitation, and confidentiality clauses in several contracts. Aqreva also alleged that they committed various torts, including tortious interference with a contract, misappropriation of a trade name, misappropriation of trade secrets, civil conspiracy, and fraud. The circuit court granted summary judgment in favor of Eide Bailly, Brandt, Kampmann, and LJB with respect to all claims except for those concerning: (1) Kampmann's employment agreement; and (2) Brandt's and LJB's alleged tortious interference with a contract. Aqreva appeals. We affirm.

**Facts and Procedural History**

[¶2.]        In 1999, Eide Bailly[1] purchased a medical practice management group from Lee Brandt known as Medical Practice Management. As part of the sale, Brandt also negotiated for an ownership interest in Eide Bailly becoming an equity principal subject to Eide Bailly's Partnership Agreement. Brandt's duties involved operating Eide Bailly's medical practice management division, including serving as the primary contact for division clients. Shelly Kampmann, a bookkeeper that worked closely with Brandt in the 1990s, also agreed to provide bookkeeping services for Eide Bailly.

---

1.        Eide Bailly is an accounting firm headquartered in North Dakota.

[¶3.] Brandt signed a restated partnership agreement with Eide Bailly on October 7, 2009. Section 18.2 of the 2009 partnership agreement included a non-compete provision that prohibited a partner/principal that withdraws, retires, or becomes disabled from engaging in "public accountancy" in any county where an Eide Bailly office was located; engaging in any activity that was detrimental to Eide Bailly; or causing a client of the partnership to cease doing business with Eide Bailly. The partnership agreement also provided that if a "partnership client" engaged a former partner/principal for "accounting services," the former partner/principal would be required to pay 125 percent of the gross fee to Eide Bailly. Aqreva does not contend that Brandt breached any portion of the 2009 partnership agreement, nor is there evidence that Brandt provided services to any of Eide Bailly's clients or took action detrimental to Eide Bailly after Eide Bailly sold its medical management practice to Aqreva in 2010. There is also no dispute that Brandt was not a certified public accountant and could not provide public accounting services.

[¶4.] In 2010, Aqreva purchased the medical practice management division from Eide Bailly. The parties executed an asset purchase agreement (the APA) to effectuate the sale. The terms of the APA included a $4,000,000 purchase price and a governing law provision requiring application of Delaware law. Pursuant to the agreement's introductory language, the only parties to the APA were Aqreva and Eide Bailly. Dave Stende, Chief Operating Officer of Eide Bailly, signed on behalf of Eide Bailly; and Sachin Aggarwal, Chief Executive Officer of Aqreva, signed on behalf of Aqreva. Among numerous other provisions, the APA included a non-

compete clause, which pledged that Eide Bailly would not compete with Aqreva on medical billing or practice management for four years after closing.[2]

[¶5.]     When Aqreva purchased Eide Bailly's medical practice management division, it also contracted with Kampmann to provide bookkeeping services. On August 12, 2010, Kampmann signed a confidentiality agreement with Aqreva. The agreement documented Aqreva's and Kampmann's understanding with respect to proprietary information and stated that Kampmann was an at-will employee.

[¶6.]     At the same time that Eide Bailly sold the medical practice management division to Aqreva, Brandt resigned from Eide Bailly and signed a separate consulting agreement with Aqreva. This consulting agreement was a condition precedent to closing the APA. Its purpose was to ease the transition of the sale. Brandt and Aggarwal (CEO of Aqreva) signed the first consulting agreement on August 9, 2010, one day before Eide Bailly and Aqreva executed the APA. The consulting agreement contained a 12-month term, compensation, a list of Brandt's duties, and a covenant not to compete. Eide Bailly was not a party to the consulting

---

2.     Section 9(i) of the APA provided:

> Seller's Covenant Not to Compete or Solicit:
> For a period of four (4) years from and after the Closing Date, Seller shall not in the United States, (a) engage directly or indirectly in any business that the Division conducts as of the Closing Date, (b) solicit any of the customer accounts acquired by Buyer for medical billing or practice management services, or (c) induce any employee of Buyer, including without limitation employees of Seller who become employees of Buyer as of the Closing Date, to terminate his or her employment with Buyer or recruit or hire such person for another company. Notwithstanding the foregoing, no owner of less than 1% of the outstanding stock of any publicly traded corporation shall be deemed to engage solely by reason thereof in its business.

agreement; however, in the APA, Eide Bailly agreed to use "commercially reasonable means" to enforce Eide Bailly's non-compete clause with Brandt found within §18.2 of the 2009 partnership agreement and thereby prevent Brandt "from engaging in such competitive activities."[3] Despite the APA's provision concerning the consulting agreement, Brandt did not sign the APA, and there is no evidence that he reviewed any of the APA's terms or conditions prior to its execution other than §2 containing the basic transaction details.

[¶7.]     Brandt agreed to a second consulting agreement on September 1, 2011, and a third agreement on September 27, 2012.[4]  The 2012 agreement included an initial term of six months (starting on September 1, 2012), with three automatic six-

---

3.     Section 9(j)(i) of the APA stated:

> Brandt and Pavek's Covenants Not to Compete.  In the event Lee Brandt or Rick Pavek competes or threatens to compete with Buyer in violation of their respective Consulting Agreement and Employment Agreement agreements with Buyer, Seller agrees:

> Seller will use all commercially reasonable means, at its expense, including the institution of action against either for injunctive relief, to enforce the terms of Seller's separate non-compete agreement(s) with Brandt and Pavek in order to prevent Brandt or Pavek, as the case may be, from engaging in such competitive activities.  Buyer may participate in any action brought by Seller at Buyer's expense.  Seller shall consult with Buyer prior to initiating any action, during the course of any litigation, and during any settlement discussions.

> Notwithstanding the foregoing, Seller shall not be obligated to bring an action against Brandt or Pavek for monetary damages and Seller will have no further obligation or liability of any kind to Buyer in the event Brandt or Pavek breach the terms of their covenants not to compete with Buyer.

4.     Under the terms of all three agreements, Brandt served as an independent contractor and not as Aqreva's agent or employee.

month renewal periods.[5]  The renewals occurred as provided in the agreement, and the last renewal term expired on August 31, 2014.  Neither party signed another agreement and Brandt ceased working for Aqreva at the end of that year.[6]

[¶8.]      Part of Aqreva's lawsuit involves its allegation that Brandt violated his consulting contract by working with three groups: (1) Midwest Ear, Nose & Throat (MENT); (2) Anesthesia Physicians; and (3) Physicians Laboratory.  Aqreva's relationship with MENT began in 2014 when Aqreva began providing it bookkeeping services.  Despite an allegation that Brandt and Kampmann discussed working with MENT in an independent capacity separate from the services they provided to Aqreva, it is undisputed that MENT remained Aqreva's client.

[¶9.]      At some point, Anesthesia Physicians, Aqreva's largest client in the Sioux Falls area, heard a presentation from McKesson, Inc. (McKesson), another medical practice management group, and requested that McKesson audit Aqreva's billing.  McKesson performed the work and then offered to provide billing services to Anesthesia Physicians at a lower rate.  It is undisputed that Brandt, who had been working with Anesthesia Physicians since 1999, helped Aqreva retain

---

5.    The successive agreements contained similar provisions and are referred to collectively as the "consulting agreement."

6.    While consulting for Aqreva, Brandt brought in several new clients, including Summit Health, Dakota Endocrinology, Windom Medical Center, Sweet Dreams Anesthesia, and Glacial Lakes Orthopedics.  Aqreva never paid Brandt for these new client referrals even though the consulting agreements required he be paid referral fees, resulting in Brandt's counterclaim for breach of the consulting agreement.

Anesthesia Physicians as a client despite competition from McKesson.[7] When Brandt left Aqreva in 2014, Anesthesia Physicians initially divided its work between Aqreva and McKesson before transferring to McKesson in September 2015.

[¶10.]      In late 2012, Physicians Laboratory, Ltd. (Physicians Laboratory) sought medical practice management services because it was losing its administrator.  It contacted Brandt individually rather than approaching Aqreva.  Shortly thereafter, Brandt approached Aqreva's President, Richard Pavek, and requested permission to perform services for Physicians Laboratory independently from his work for Aqreva.  It is undisputed that Pavek gave Brandt permission, although the parties now dispute Pavek's knowledge of the scope of services Brandt provided Physicians Laboratory.[8]  In 2013, Brandt formed Medical Practice Management, Inc., (Medical Practice Management) to bill Aqreva and Physicians Laboratory.  Beginning on April 30, 2013, and ending on September 30, 2014, Aqreva paid Brandt with monthly checks made out to Medical Practice Management and Lee Brandt.  Neither party challenges the fact that Medical Practice Management provides the same services as Aqreva's medical practice management division.

[¶11.]      In June 2013, Kampmann began working for Brandt's Medical Practice Management.  That year, she received $807.34 for the services she provided it.  In

---

7.    Anesthesia Physicians considered retaining Brandt individually when they learned he was leaving Aqreva at the end of 2014, but then rescinded the offer.

8.    Pavek's knowledge with respect to Brandt's relationship with Physicians Laboratory is largely irrelevant due to our conclusion that the non-compete agreement between Aqreva and Brandt is an unlawful restraint on trade.

2014, Kampmann provided bookkeeping services for Physicians Laboratory as an employee of Medical Practice Management. She resigned from Aqreva in May 2014 and Medical Practice Management in November 2014 but continued to provide some part-time independent contract work thereafter.

[¶12.] In November 2014, Aqreva sent Brandt a cease and desist letter indicating that the name of his business, "Medical Practice Management, Inc." was too similar to the name of the medical practice management division of its company. After he received the letter, Brandt changed the name of his company to LJB.

[¶13.] Aqreva sued Eide Bailly, Brandt, Kampmann, and LJB on April 21, 2015, alleging numerous causes of action, including claims for: (1) breach of the APA by Brandt and Eide Bailly; (2) breach of the consulting agreements by Brandt; (3) breach of the APA by Eide Bailly; (4) breach of the employment agreement by Kampmann; (5) tortious interference with a contract by Brandt and LJB; (6) misappropriation of a trade name by Brandt and LJB; (7) misappropriation of trade secrets by Brandt, Kampmann and LJB; (8) civil conspiracy by Brandt and Eide Bailly; and (9) fraud by Eide Bailly. Brandt filed a four-count counterclaim against Aqreva alleging it failed to pay Brandt for referral fees and services under his consulting agreement.[9]

[¶14.] Eide Bailly, Brandt, Kampmann, and LJB moved for summary judgment on Aqreva's claims. Aqreva affirmatively moved for partial summary judgment on its claims in counts one through six. The court denied Aqreva's motion

---

9. Brandt's counterclaim alleged: (1) breach of consulting agreements; (2) breach of contract; (3) quantum merit; and (4) unjust enrichment.

and granted summary judgment in favor of Eide Bailly, Brandt, and Kampmann, dismissing all of Aqreva's claims except for counts four and five. On August 30, 2019, the parties agreed to voluntarily dismiss, without prejudice, counts four and five and Brandt's counterclaim. Aqreva appeals the court's order granting summary judgment to Eide Bailly and the denial of its cross motion for the same.

## Analysis and Decision

[¶15.]      Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). "A disputed fact is not material unless it would affect the outcome of the suit under the governing substantive law in that a reasonable jury could return a verdict for the nonmoving party." *Gul v. Ctr. For Family Medicine*, 2009 S.D. 12, ¶ 8, 762 N.W.2d 629, 633. The moving party carries "the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." *Johnson v. Matthew J. Batchelder Co., Inc.*, 2010 S.D. 23, ¶ 8, 779 N.W.2d 690, 693. All facts are viewed in the light "most favorabl[e] to the nonmoving party[.]" *North Star Mutual Ins. Co. v. Rasmussen*, 2007 S.D. 55, ¶ 14, 734 N.W.2d 352, 356.

### I.      Breach of Contract Claims

[¶16.]      Aqreva alleges several breach of contract claims. Count one alleges that Eide Bailly and Brandt breached the APA. The circuit court granted summary judgment on this claim for two reasons. First, it held that Brandt was not a party

to the APA and therefore could not breach it. Second, it concluded that Eide Bailly met its obligations under the APA.

[¶17.] Delaware law controls interpretation of the APA.[10] Under governing principles of Delaware contract law, "Absent unusual circumstances . . . , the ordinary rule is that only the formal parties to a contract are bound by its terms." *Alliance Data Sys. Corp. v. Blackstone Capital Partners, V.L.P.*, 963 A.2d 746, 760 (De. Ch.), aff'd, 976 A.2d 170 (Del. 2009).

A. Alleged Breach of APA by Brandt

[¶18.] Aqreva acknowledges that Brandt is not listed as a party in the APA itself and agrees that generally speaking, only the parties to a contract are bound by its terms. Nevertheless, Aqreva contends that this general rule does not apply in unusual circumstances, which it claims exist in this case. In Aqreva's view, Brandt was a party to the APA because it included a condition precedent requiring Brandt to sign a consulting agreement with Aqreva before Aqreva was obligated to close

---

10. On appeal, Aqreva challenges the circuit court's reference to *JAS Enterprises, Inc. v. BBS Enterprises, Inc.*, 2013 S.D. 54, ¶¶ 23–24, 835 N.W.2d 117, 125-26. However, in its detailed memorandum decision, the circuit court explicitly stated that the case was not controlling because it applied South Dakota law rather than Delaware law. We agree that the case is not controlling, and we apply Delaware law pursuant to the governing law provision in the contract; but like any court, we are free to consider authority from other jurisdictions, including our own, in assessing legal questions.

The issue in *JAS Enterprises* is similar to the issues presented in this case. In *JAS Enterprises*, an associate of JAS did not sign the purchase agreement, but executed a separate business consulting agreement with the buyer. The buyer then argued that the associate violated the covenant not to compete included in the purchase agreement. In resolving that dispute, we held that non-parties to a covenant not to compete are not bound by the terms of the non-compete. *Id.*

with Eide Bailly. Further, it claims that Brandt received consideration as if he were a party at the closing of the transaction.

[¶19.] But in making these claims, Aqreva cites no authority to suggest that the existence of a condition precedent, such as the one conditioning the APA's closing on Brandt's signing of a consulting agreement, renders the subject of that condition a party to the contract. Nor does Aqreva support the proposition that Brandt received consideration for the transaction beyond its observation that Brandt accepted distributions from Eide Bailly, pursuant to their partnership agreement, that were incidental to closing the transaction.[11]

[¶20.] The sole fact that Brandt received a distribution from Eide Bailly following Eide Bailly's sale to Aqreva does not make Brandt a party to the transaction when the contract itself fails to do so. Contracts sometimes benefit non-parties. *Black Bear v. Mid-Central Educ. Coop.*, 2020 S.D. 14, ¶ 14, 941 N.W.2d 207, 213 (discussing the difference between incidental beneficiaries and third-party beneficiaries with standing to sue). Moreover, as Brandt, Kampmann, and LJB note in their brief, if receiving a financial benefit was sufficient to create a contract relationship, "then any time an entity sold assets under a purchase agreement and distributed money from the sale to owners or former owners, those recipients would

---

11. At the time of the sale, Brandt had reached Eide Bailly's mandatory retirement age of 62 and was no longer an owner but rather an employee or "income principal." In accordance with his partnership agreement with Eide Bailly, however, Brandt did receive distributions as a former equity principal, as did Eide Bailly's many other equity partners. Those distributions included an initial payment for the sale and then subsequent payments annually until the end of fiscal year 2015.

be parties to the purchase agreement and subject to its terms." This simply is not the case.

[¶21.]    Moreover, because there is no evidence within the writing indicating that Brandt was a party to the APA, Aqreva's claim fails to meet the basic elements necessary to create a contract under Delaware law. "[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Absent an ambiguity, in reviewing a contract, the question we must ask is "not what the parties to the contract intended to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chem. Co.*, 616 A.2d 1192, 1196 (De. 1992). The terms of the contract, in this instance, are quite clear. The APA was "by and between AQREVA, INC., . . . and EIDE BAILLY, LLP." For these reasons, the circuit court did not err when it dismissed Aqreva's claim that Brandt violated the APA on the basis that Brandt was not a party to the agreement.

B. Alleged Breach of APA by Eide Bailly

[¶22.]    Aqreva also asserts that Eide Bailly breached the APA by violating its covenant not to compete with Aqreva and soliciting its customers or employees. Per the plain terms of the APA, Eide Bailly agreed it would refrain from: engaging in business that Medical Practice Management conducted as of the closing date; soliciting accounts from the practice; and inducing employees to leave the group after closing.

[¶23.] Aqreva presented no evidence to suggest that Eide Bailly engaged in any activity that would violate the APA. Aqreva's President, Richard Pavek, acknowledged as much during his deposition when he stated that he was unaware of any activity that Eide Bailly engaged in that would constitute a breach. And while Aqreva argues that Eide Bailly knew that Brandt was competing with Aqreva in violation of Brandt's non-compete, a claim we address infra, Brandt's alleged violations of his separate consulting agreement with Aqreva did not constitute violations of the APA by Eide Bailly. There is no evidence in this record supporting the allegation that Eide Bailly competed with Aqreva in violation of the APA. The circuit court did not err by granting Eide Bailly summary judgment and dismissing count one.

C. Alleged Non-Compete and Non-Solicitation Breaches by Brandt

[¶24.] Count two of Aqreva's complaint alleges that Brandt violated the non-compete and non-solicitation provisions under Brandt's consulting agreement with Aqreva. The circuit court barred application of the restrictive covenants in Brandt's consulting agreement as unlawful.

        i. Non-compete clause

[¶25.] "Any contract restraining exercise of a lawful profession, trade, or business is void to that extent, except as provided by [SDCL] 53-9-9 to 53-9-12, inclusive." SDCL 53-9-8. In applying this rule, we have noted that "SDCL 53-9-8 is generally denoted as a prohibition against agreements in 'restraint of trade.' However, its provisions are much broader as the statute actually prohibits any agreements which restrain a lawful profession, trade or business." *Communication*

-12-

*Tech. Sys., Inc v. Densmore*, 1998 S.D. 87, ¶ 13, 583 N.W.2d 125, 127-28. We assess whether a contract is an unlawful restraint on trade using a three-part test. First, we review whether "the conduct of the parties concern[s] a lawful profession, trade or business." *Id.* If this prerequisite is met, we review whether "there has been a material restraint upon exercising that lawful profession, trade or business." *Id.* Finally, we assess whether any of the statutory exceptions apply. *Id.*

[¶26.] The first element of our three-part test is satisfied. Aqreva offers various accounting services to assist medical practitioners. Likewise, Brandt worked in the medical management field for over forty years, providing his clients with office accounting, credentialing, and contracting services. It is beyond debate that both Aqreva and Brandt are engaged in a lawful profession, trade, or business.

[¶27.] Likewise we agree with the circuit court's determination that the second element is met because the consulting agreement between Brandt and Aqreva was a restraint on Brandt's lawful profession, trade or business. After all, by the plain terms of the agreement, Brandt was prohibited from "engag[ing] in the business of [m]edical [p]ractice [m]anagement anywhere in the United States."

[¶28.] Having determined that Aqreva has established the first two elements, we next ask whether Aqreva can show that the agreement falls within any of the exceptions to the general rule precluding restraint of any lawful profession, trade or business. Three statutory exceptions exist: SDCL 53-9-9 (sale of good will); SDCL 53-9-10 (dissolution of a partnership); and SDCL 53-9-11 (agreement between employee and employer). These statutory "exceptions must be construed narrowly so as to promote the prohibition against contracts in restraint of trade." *Cent.*

*Monitoring Serv., Inc. v. Zakinski*, 1996 S.D. 116, ¶ 9, 553 N.W.2d 513, 516. Aqreva argues that SDCL 53-9-9 and SDCL 53-9-11 apply.

[¶29.]    SDCL 53-9-9 provides:

> Any person who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or other specified area, as long as the buyer or person deriving title to the good will from the seller carries on a like business within the specified geographical area.

The circuit court concluded that SDCL 53-9-9 did not apply because Brandt was not listed as a seller in the APA and therefore could not have sold any of Eide Bailly's good will. On appeal, Aqreva reasserts its claim that the restrictive covenants (contained within the non-compete clauses of Brandt's consulting agreements) are enforceable because Brandt helped build Eide Bailly's good will, profited from the APA, and signed the consulting agreements containing the non-compete clauses.[12]

[¶30.]    But as the circuit court adroitly explained, Aqreva's argument requires that we "disregard what the documents in this case clearly state and instead consider what Aqreva argues [were] the parties' intentions." Brandt was not a party to the APA and did not enter into an agreement to sell good will. This renders SDCL 53-9-9 inapplicable and Brandt's non-compete agreement unenforceable.[13]

---

12.    Aqreva paid Eide Bailly, and not Brandt, $1,000,000 for good will. There is no evidence in the APA, the consulting agreements, or anywhere else in the record that Brandt sold Aqreva good will. In fact, Brandt sold any good will he had to Eide Bailly in 1999 when Eide Bailly purchased Medical Practice Management from him. Because he sold his good will decades before this dispute, he had none to sell to Aqreva.

13.    Without an enforceable non-compete agreement, we need not address whether genuine issues of material fact exist establishing that Brandt

<span style="float:right">(continued . . .)</span>

[¶31.]    Additionally, Aqreva argues that the circuit court erred in ruling that the exception allowing restraint of trade clauses for employees under SDCL 53-9-11 did not apply because, according to Aqreva, Brandt should be considered a part-time employee rather than as an independent consultant. SDCL 53-9-11 provides:

> An *employee may agree with an employer* at the time of employment or at any time during his employment *not to engage directly or indirectly in the same business or profession as that of his employer* for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first or second class municipality, or other specified area for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on a like business therein.

*Id.* (emphasis added).

[¶32.]    The circuit court, in rejecting this claim, relied on the language of Brandt's consulting agreement providing that Brandt "is not an agent or employee of Aqreva and is not authorized to act on behalf of Aqreva." Because the court concluded that it could not ignore this language, it held that SDCL 53-9-11 did not apply. We agree. Per the plain language of SDCL 53-9-11, the Legislature has limited the provisions of this statute to an *"employee's* covenant not to compete with his *employer." Comm'n Tech. Sys., Inc.*, 1998 S.D. 87, ¶ 15, 583 N.W.2d at 128

---

(. . . continued)
    violated the covenant not to compete when he allegedly worked with MENT, Anesthesia Physicians, and Physicians Laboratory.

-15-

(emphasis in original).[14] Therefore, because Brandt was not an agent or employee of Aqreva, the exception does not apply.

### ii. Non-solicitation clause

[¶33.] With respect to the non-solicitation provisions in Brandt's consulting agreement, Aqreva argues that the circuit court erred in ruling that Brandt did not breach the non-solicitation provision by hiring Kampmann to work for Medical Practice Management. "An agreement not to disclose information or solicit, unlike a covenant not to compete, is free from challenge as a general restraint on trade. However, such covenants are strictly construed and enforced only to the extent reasonably necessary to protect the employer's interest in confidential information." *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F. Supp. 2d 1078, 1101 (D.S.D. 2006) (citing *1st American Systems, Inc. v. Rezatto*, 311 N.W.2d 51, 57 (S.D. 1981)).

[¶34.] According to his consulting agreement, Brandt was only prohibited from inducing "*any consultant, officer or manager*" of Aqreva to terminate his or her relationship with Aqreva or recruit or hire such person for another company." (Emphasis added.) Because the court held that no facts in the record support the conclusion that Kampmann was a consultant, an officer, or a manager of Aqreva, it dismissed this claim.

[¶35.] On appeal, Aqreva argues that the circuit court ignored evidence that Kampmann was a manager. Its argument centers around one line of deposition testimony in which Kampmann stated that the other bookkeepers "worked for [her]"

---

14. *But see* SDCL 53-9-12 (creating special rules for captive insurance agents).

and testimony from another witness, Carla Campbell, a "former client account manager," that Kampmann had some managerial duties and trained new employees. The title of manager, according to Aqreva, was not required for her to be defined as a manager.

[¶36.] We agree that a title is not necessarily required to establish that Kampmann was a manager. But as the circuit court observed, Aqreva's argument is contrary to its own records, which describe Kampmann as a "senior associate" and an "accounting services coordinator." Indeed, Pavek, Aqreva's President and head of its Sioux Falls office, testified that Aqreva had three managers and failed to name Kampmann as one of them. And Pavek, unlike Campbell, served in a position of authority in the company with knowledge of its hierarchy.

[¶37.] "Speculation and innuendo . . . are not enough to raise a genuine issue of material fact" for summary judgment purposes. *Schwaiger v. Avera Queen of Peace Health Services*, 2006 S.D. 44, ¶ 13, 714 N.W.2d 874, 880. Because there are no facts in this record to support the conclusion that Kampmann was a manager, the circuit court did not err when it granted Brandt's motion for summary judgment with respect to the non-solicitation agreement.

D. Alleged Violation of Non-compete Clause by Eide Bailly

[¶38.] The final count pertaining to breach of contract, Count three, involves Aqreva's allegation that Eide Bailly breached the APA by failing to enforce the non-compete agreement Eide Bailly entered into with Brandt in the 2009 partnership agreement. Aqreva claims the record shows that Eide Bailly knew Brandt was competing with Aqreva's customers because Eide Bailly prepared Medical Practice

Management's 2013 tax return and received Medical Practice Management's mail at its office. According to Aqreva, these facts establish that Eide Bailly breached § 9(j) of the APA, which requires Eide Bailly to use commercially reasonable means to prevent Brandt from violating the 2009 partnership. However, Brandt had to breach his 2009 partnership agreement with Eide Bailly to trigger Eide Bailly's obligation under the APA. This is because, according to the APA's plain language, Eide Bailly only agreed to "use all commercially reasonable means . . .to enforce the terms of *[Eide Bailly's] separate non-compete agreement(s)* with Brandt and Pavek." (Emphasis added.)

[¶39.] It is undisputed that Brandt did not violate the non-compete provisions in §18.2 of the partnership agreement with Eide Bailly. Accordingly, Eide Bailly had no legal basis to assert a breach or attempt to enforce the terms of the non-compete provisions in the 2009 partnership agreement. Moreover, section 9(j) of the APA specifically provides that Eide Bailly "will have no further obligation or liability of any kind to [Aqreva] in the event Brandt . . . breach[es] the terms of [his] covenants not to compete with [Aqreva.]" The circuit court did not err when it dismissed Count three.

## II. Misappropriation of Trade Name against Brandt and LJB

[¶40.] Aqreva alleges that Brandt misappropriated the "Medical Practice Management" trade name. Because both companies operated out of Sioux Falls and provided the same or similar services, Aqreva argues the misappropriation confused customers to such a degree that use of the name constituted a trade name violation.

[¶41.]     "A trade name symbolizes the reputation of a company or organization and the activities it engages in.  A 'trademark' is used to identify and distinguish the various products sold by that business.  And a 'service mark' is used to identify and distinguish the services rendered by that business."  J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 9:3 (5th ed. 2020 updated).  Trademarks and trade names are two separate subsets in the wider subject of unfair competition, and yet, they are sometimes used interchangeably.  In our jurisprudence, for instance, we have cited trademark infringement cases for support when analyzing protection of a trade name.  *See e.g., First W. Fed. Sav. Bank v. First W. Bank Sturgis*, 2001 S.D. 133, ¶ 12, 636 N.W.2d 454, 457 (trade name); *Phipps Bros. Inc. v. Nelson's Oil and Gas, Inc.*, 508 N.W.2d 885, 887 (S.D. 1993) (trademark infringement).[15]

[¶42.]     "It is well established that generic terms are not entitled to trademark protection because such words are in the public domain and available for all to use."  *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 486 (8th Cir. 1991).  *See also*

---

15.     *See also* McCarthy, *supra* at § 9:1 (noting that the resolution of infringement claims for both trademarks and trade names involves application of the "likelihood of confusion test" adopted by both state and federal courts, focusing, in part, on whether the name similarity creates confusion among ordinary consumers.).  One significant difference between trademarks and trade names, however, is that trademarks can be *registered* and protected under the Lanham Act, whereas a trade name cannot be federally registered.  *Id.*  "The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling.  Though in the end consumers also benefit from the Act's proper enforcement, the cause of action is for competitors, not consumers."  *POM Wonderful, LLC, v. Coca-Cola Co.*, 573 U.S. 102, 107, 134 S. Ct. 2228, 2234, 189 L. Ed. 2d 141 (2014).  The Lanham Act also permits a suit in federal court for infringement of a trade name.  McCarthy, *supra* at § 9:4.

McCarthy, supra at § 9.2 ("A generic name cannot qualify as a trade name and is never any one organization's exclusive property."). Aqreva has presented no evidence nor cited any authority to suggest that the name "Medical Practice Management" is anything more than a description of the "basic nature of [a] product." *See Schawn's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 974 (8th Cir. 2006). Without a protectable trade name, we need not conduct a misappropriation analysis.

[¶43.]      But even if we assume that Medical Practice Management is a viable trade name, Aqreva has not presented sufficient facts to preclude summary judgment. When a party claims misappropriation of a trade name, we assess whether there is a "likelihood of confusion, deception or mistake among an appreciable number of ordinary consumers." *First W. Fed. Sav. Bank*, 2001 S.D. 133, ¶ 12, 636 N.W.2d at 457 (analyzing a service mark infringement). This "is a factual question to be resolved by considering various factors related to the case at hand." *Id.* "When determining whether there is a likelihood of confusion, the [fact-finder] should examine: the strength of the plaintiff's service or trademark; the competitive proximity of the parties' marks, the alleged infringer's intent to confuse; the degree of care reasonably expected of potential customers; the similarity between the parties' marks; and evidence of actual confusion." *Id.* ¶ 13, 636 N.W.2d at 457. "Proof of likelihood of confusion in trademark infringement cases does not require actual confusion; however, a mere possibility is not enough. There must be a substantial likelihood that the public will be confused." *Id.*

[¶44.]    Here, a careful search of the record does not reveal even a scintilla of evidence that the name was used to confuse customers. Other than Aqreva and Physician's Laboratory (who was never one of Aqreva's customers), the record does not indicate that any other third-party was aware of Brandt's business name.[16] This is significant because "when determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion." *Life Technologies, Inc. v. Gibbco Scientific, Inc.*, 826 F.2d 775, 777 (8th Cir. 1987). "[E]ven several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion." *Duluth News-Tribune v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996). No facts in this record support Aqreva's claim that Brandt intended to confuse or actually confused third parties.

[¶45.]    Further, Brandt has changed the name to LJB. Therefore, even if the term "Medical Practice Management" was somehow a protected trade name, Aqreva has failed to demonstrate how it was damaged by any infringement. "More is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff that some of his consumers were confused." *Cellular*

---

16.    Although not necessary to dispose of Aqreva's claim, we also note that it is undisputed that Aqreva was aware that Brandt was using the name and allowed him to do so without objection for some time. In fact, between April 2013 and September 2014, Aqreva often paid Brandt by checks made payable to Medical Practice Management. Near the time that Brandt quit, Aqreva sent a cease and desist letter informing Brandt that it challenged his use of the name. Shortly after, on February 10, 2015, Brandt retitled his business LJB, Inc.

*Sales, Inc.*, 942 F.2d at 486. Aqreva has failed to produce sufficient evidence in support of its trade name claim to survive summary judgment.

### III. Misappropriation of trade secrets against Brandt, Kampmann, and LJB

[¶46.] Aqreva next alleges that Kampmann, Brandt, and LJB misappropriated trade secrets for personal gain by using trade secrets to procure and provide services for clients for Brandt's new business, Medical Practice Management (now LJB). Aqreva claims that Brandt accepted work from Physicians Laboratory and although Brandt received approval from Pavek, Aqreva alleges Brandt failed to disclose the full scope of the work performed. Further, Aqreva claims that Brandt used Aqreva's formulas, compilations, and forms to immediately begin servicing Physicians Laboratory. Aqreva also avers that Brandt used trade secrets to quickly transition and service Anesthesia Physicians' accounts after it terminated its contract with Aqreva in 2014. The circuit court rejected Aqreva's claims because, although it identified information that it considered trade secrets, Aqreva produced nothing more than bare allegations that Brandt, Kampmann, and LJB used any particular trade secret, misappropriated them, or caused damages to Aqreva.

[¶47.] Aqreva bears the burden of proving the existence of a trade secret. "Without a proven trade secret, there can be no action for misappropriation, even if [the] defendant['s] actions were wrongful." *Daktronics, Inc. v. McAfee*, 1999 S.D. 113, ¶ 12, 599 N.W.2d 358, 361.

[¶48.] SDCL 37-29-1(4) provides that a trade secret is:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

[¶49.] "The existence of a trade secret is a mixed question of law and fact." *Paint Brush Corp., Parts Brush Div. v. Neu*, 1999 S.D. 120, ¶ 14, 599 N.W.2d 384, 389. "The legal question is whether the information in question could constitute a trade secret under the first part of the definition of a trade secret under SDCL 37-29-1(4)." *Daktronics, Inc.*, 1999 S.D. 113, ¶ 13, 599 N.W.2d at 361. More specifically, we first determine, as a matter of law, whether the alleged secret constitutes "information, including a formula, pattern, compilation, program, device, method, technique or process. The factual inquiry involves the remaining subsections of SDCL 37-29-1(4)(i) and (ii)." *Id.*

[¶50.] Here, the only trade secrets identified by Aqreva were certain formulas, compilations, and bookkeeping forms which it alleges Brandt would have needed to use to provide services to Anesthesia Physicians. Even assuming that these forms meet the definition of trade secrets under SDCL 37-29-1(4), there are no factual disputes in this record precluding summary judgment. Aqreva failed to present any evidence that Brandt or Kampmann used the trade secrets to their benefit because Aqreva did not show that either Kampmann or Brandt ever worked with Anesthesia Physicians individually. Additionally, Aqreva does not dispute that Physicians Laboratory approached Brandt in 2012 to retain his services, contradicting Aqreva's allegation that Brandt or Kampmann used alleged trade

secrets to solicit Physicians Laboratory to abandon Aqreva and hire Brandt instead. It is also undisputed that Pavek gave Brandt permission to work with Physicians Laboratory individually.

[¶51.] Because there is no evidence in the record to support Aqreva's claim for misappropriation of trade secrets, or evidence that Aqreva sustained damages as a result, the circuit court did not err when it granted Brandt, Kampmann, and LJB summary judgment.

### IV. Civil Conspiracy against Brandt and Eide Bailly

[¶52.] Aqreva also argues that Brandt and Eide Bailly conspired to compete against and divert business from Aqreva and generate market confusion to Aqreva's detriment. Civil conspiracy requires showing: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 59, 758 N.W.2d 436, 455 (emphasis omitted). Importantly, civil conspiracy does not exist as an independent cause of action, but rather may be alleged "only after an underlying tort claim has been established." *Id.*

[¶53.] The circuit court rejected Aqreva's civil conspiracy claim on the basis that the record did not show any evidence that Brandt or Eide Bailly had a common plan or meeting of the minds to divert business away from Aqreva or commit a tort against Aqreva. Further, the circuit court held that because it dismissed Aqreva's fraud claim against Eide Bailly, as discussed herein, there was no independent tort

left to support a charge of civil conspiracy. Similarly, the court dismissed all of the tort claims against Brandt, or they were voluntarily dismissed by Aqreva.

[¶54.]     Based on our review of the record, and our affirmance of the dismissal of the fraud claim infra, we agree that Aqreva has failed to allege sufficient facts to support a cognizable tort on which to base its conspiracy claim. All claims alleging independent torts have either been properly dismissed by the circuit court or voluntarily dismissed by Aqreva.

### V.     Fraud against Eide Bailly

[¶55.]     Aqreva argues that Eide Bailly committed fraud by representing in §9(j)(i) of the APA that the separate non-compete agreement between Eide Bailly and Brandt, from the 2009 partnership agreement, could be used to preclude Brandt from competing with Aqreva. Further, Aqreva argues Eide Bailly listed Brandt as a person "with knowledge" of this provision but did not inform Brandt of it, and Aqreva claims it relied on the representations in §9(j)(i) in closing the transaction. The circuit court, however, dismissed Aqreva's claim finding that it lacked specificity.

[¶56.]     Fraud requires proof of three elements. First, the representation at issue must be "made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made[.]" *N. American Truck & Trailer, Inc. v. M.C.I. Comm. Servs., Inc.*, 2008 S.D. 45, ¶ 8, 751 N.W.2d 710, 713. Second, the representation must have been "made with intent to deceive and for the purpose of inducing the other party to act upon it[.]" *Id.* Finally, the person to whom the representation is made must show "that he did in fact rely on it and was

induced thereby to act to his injury or damage." *Id.* To avoid summary judgment, "the essential elements" of fraud must be "adequately supported by alleged facts." *Ehresmann v. Muth*, 2008 S.D. 103, ¶ 22, 757 N.W.2d 402, 406.

[¶57.] Here, Aqreva produced nothing more for the circuit court's review than conclusory allegations of fraud with no reference to evidence in the record to support its claim. As the circuit court concluded, "allegations of fraud and deceit without specific material facts to substantiate them will not prevent summary judgment." *Paint Brush Corp., Parts Brush Div.*, 1999 S.D. 120, ¶ 22, 599 N.W.2d at 391. "Fraud is not to be presumed, but must be strictly proven." *Bruske v. Hille*, 1997 S.D. 108, ¶ 11, 567 N.W.2d 872, 876.

[¶58.] There is no evidence in the record that Eide Bailly ever made an inaccurate statement of fact to Aqreva when executing the APA, as is required to establish the first element of fraud. Aqreva and Eide Bailly, sophisticated parties, negotiated and signed a purchase agreement that included conditions precedent and covenants. In drafting the APA, the only obligation the parties agreed Eide Bailly would assume, under the terms of the non-compete provision in the 2009 partnership agreement, was the requirement that Eide Bailly use commercially reasonable means to prevent Brandt from engaging in competitive activities. Neither the agreement itself nor the underlying record supports the contention that Eide Bailly fraudulently induced Aqreva to agree to any of the APA's provisions.

[¶59.] Furthermore, there is no evidence that Aqreva relied on any alleged representations made concerning the non-compete provisions. In fact, the opposite appears to be true. In addition to signing the APA, Aqreva negotiated and executed

three consulting agreements with Brandt independent of the APA that included non-compete and non-solicitation clauses. If, as Aqreva suggests, it relied on alleged representations from Eide Bailly regarding Eide Bailly's ability to enforce the 2009 non-compete clause, it would have been unnecessary to execute additional agreements with Brandt to accomplish that goal. Moreover, Aqreva does not claim that it was unaware of the terms of the non-compete provision in the 2009 partnership agreement between Eide Bailly and Brandt. Eide Bailly's legal obligations with respect to Brandt's allegedly competitive business practices began and ended with the non-compete agreement between Brandt and Eide Bailly as set forth in §18.2 of the 2009 partnership agreement—none of which applied to Aqreva. The circuit court did not err when it dismissed Aqreva's fraud claim.

## Conclusion

[¶60.] The circuit court did not err in granting summary judgment to Eide Bailly on Counts one through three and six though nine and denying Aqreva's cross motion in its entirety.

[¶61.] As a final matter, we address Eide Bailly's motion for appellate attorney fees in the sum of $25,300.92. "Attorney fees are allowed when there is a contractual agreement that the prevailing party is entitled to attorney fees . . . ." *Fuller v. Coston*, 2006 S.D. 110, ¶ 41, 725 N.W.2d 600, 612. The APA provides recovery of reasonable attorney fees. Based on our consideration of the entire record and the extensive issues presented, we award the attorney fees requested. We affirm.

#29142

[¶62.]     GILBERTSON, Chief Justice, and JENSEN and DEVANEY, Justices, and COMER, Circuit Court Judge, concur.

[¶63.]     COMER, Circuit Court Judge, sitting for SALTER, Justice, disqualified.