#29511-aff in pt & rev in pt-MES
**2022 S.D. 57**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GUSTAV K. JOHNSON, as Personal
Representative of the ESTATE OF
SUSAN JANE MARKVE,                                          Plaintiff and Appellant,

v.

KENNETH CHARLES MARKVE                          Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT GUSINSKY
Judge

\* \* \* \*

GEORGE J. NELSON
Rapid City, South Dakota                          Attorney for plaintiff and
                                                                     appellant.


HEATHER LAMMERS BOGARD of
Costello, Porter, Hill, Heisterkamp,
    Bushnell & Carpenter, LLP
Rapid City, South Dakota                          Attorneys for defendant and
                                                                     appellee.

\* \* \* \*

ARGUED
NOVEMBER 8, 2021
OPINION FILED **09/21/22**

SALTER, Justice

[¶1.]        Acting as the personal representative of the Estate of Susan Markve, Gustav Johnson commenced this action against Kenneth Markve, alleging a variety of claims including undue influence, conversion, breach of fiduciary duty, statutory fraud, and common law fraud. The circuit court granted Kenneth Markve's motion for summary judgment after determining that there were no genuine disputes of material fact as to any of the claims. The Estate appeals, and we affirm in part and reverse in part.

## Facts and Procedural History

[¶2.]        Kenneth Markve (Ken) and Susan Johnson lived in the Hot Springs area of Fall River County and met in 2011 while playing bridge. They quickly fell in love and were engaged in the fall of 2012. Ken and Susan had met later in their lives, and both had accumulated their own property and wealth. Given the circumstances, they made a plan to enter into a prenuptial agreement, but before they did, Susan broke off the engagement following a visit with her brother, Gustav Johnson (Gus), who was opposed to the marriage.

[¶3.]        Prior to canceling their wedding plans, Ken and Susan were preparing to purchase a home. They settled on a residence in Hot Springs referred to in the record as the "Flock house." In an affidavit, Ken later explained that the two planned to purchase the home as joint tenants with rights of survivorship, though he did not indicate how or if they would share the cost of the home. The couple ultimately did not purchase the Flock house after their engagement ended.

[¶4.] Despite canceling their plan to be married, Ken and Susan continued to spend time together, and they soon rekindled their romance and were again engaged. On January 15, 2013, they entered into a prenuptial agreement using a form obtained from an unspecified internet source and without the assistance of counsel.[1]

[¶5.] The prenuptial agreement provided that "[a]ll property, including real or personal property" would "remain and be [each spouse's] separate property." Attached to the agreement and specifically incorporated into its provisions were individual schedules of separate property owned by Ken and Susan. The property Ken listed totaled approximately $1.8 million and was heavily weighted to his $1.5 million interest in a farm. Susan listed assets of approximately $1 million.[2]

[¶6.] The couple's prenuptial agreement contemplated that they would live in a home Susan already owned in Rapid City, which the agreement stated "shall remain her separate property." However, the agreement also gave Ken and Susan flexibility with respect to the joint acquisition of property in the future and even the ability to transfer property to each other:

> The parties agree and understand that nothing in the Agreement shall preclude them from acquiring property interests during the course of their marriage as joint tenants with right of survivorship or as tenants in common with undivided interests. Additionally, nothing in the Agreement shall preclude them from making binding transfers of real or personal property to the other at any time during the marriage.

---

1. Neither party has challenged the validity of the prenuptial agreement.

2. The schedules also addressed debt and indicated both parties had significant net worth. Susan's schedule reflected no debt, and Ken listed a relatively modest amount of debt.

*****

> Furthermore, nothing in this Agreement shall preclude the parties from voluntarily electing to comingle a part or all of the income from their respective properties for investment purposes or for the purpose of jointly providing for their mutual support and living expenses, or for other reasons.

[¶7.]     The prenuptial agreement also provided that if either spouse sustained a partial or total disability, the other spouse would assume responsibility and care for the disabled spouse. The agreement further allowed Ken and Susan to "voluntarily elect[ ] to comingle a part or all of the income from their respective properties . . . for the purpose of jointly providing for their mutual support and living expenses."

[¶8.]     Ken and Susan were married on January 23, 2013. For Susan's wedding ring, Ken purchased a wedding band and had it joined to an existing diamond ring that Susan owned. In the summer of 2013, the Markves went to Alaska for a bridge tournament and a vacation. Susan eventually traveled back to Hot Springs alone to attend her 50-year high school reunion, and Ken stayed in Alaska to attend to an unrelated matter. While Ken was still in Alaska, Susan purchased a home in Hot Springs that became the Markves' marital home. She paid $250,000 for the house and purchased it individually as the trustee of the Susan J. Markve Trust.[3] The record does not indicate whether Ken contributed to the purchase price at any point.

---

3.     Despite the fact that it is referenced and cited at various places throughout the record and the parties' briefs, the trust document for the Susan J. Markve Trust is not included in the record. From its uncontroverted description, it

(continued . . .)

[¶9.] In December 2013, Susan was diagnosed with glioblastoma, a deadly and incurable form of brain cancer. She underwent extensive medical care and treatment, including surgery to remove a tumor, as well as radiation, chemotherapy, and holistic care. Over the course of her treatment, Susan spent time in a swing bed facility as she transitioned from acute care in a hospital setting to skilled nursing care in her home.

[¶10.] It was during this period of time in early 2014 that Susan did two significant things with respect to her financial affairs: 1) she conveyed the Hot Springs house she held separately in her living trust by quitclaim deed to herself and to Ken as joint tenants with the right of survivorship; and 2) she executed a general power of attorney, naming Ken her agent. Susan's capacity to undertake either of these actions lies at the heart of this case.

[¶11.] Both the quitclaim deed conveying Susan's separate right to the Hot Springs home and the power of attorney were drafted by attorney Brian Hagg and signed by Susan on March 25, 2014. In two lines of an eleven-sentence affidavit, Hagg expressed the view that Susan had the capacity to convey her interest in the house and appoint Ken as her agent:

- I met with Susan two times regarding the deed and power of attorney.

- Susan was competent and very clear on what she wanted to do with the couple's marital home and desiring Ken to be her agent.

---

(. . . continued)

appears Susan established a self-settled living trust in 2003, and though the record indicates she amended it after her marriage to Ken, he was apparently not a trust beneficiary.

[¶12.]	Nevertheless, notes contained in Susan's medical records from February and March 2014 indicate she was experiencing some degree of memory and cognitive difficulty. For instance, on February 17, 2014, the medical records from the swing bed facility, Fall River Health, indicate her attending physician noted "Short Term Memory loss/confusion[.]" The subjective assessment for February 17 also stated that "Husband present and reports that this is the worst her short term memory has been and Pt did not deny." On March 9, 2014, Susan's medical records stated that "she is aware of who she is[, but she is] [n]ot oriented to where she is but was able to recall after she was told."

[¶13.]	Susan was transferred from Fall River Health to Rapid City Regional Hospital on March 11, and the hospital records indicate she was experiencing slurred speech and memory problems. Susan returned to Fall River Health on March 19, but she was largely unresponsive. On Monday, March 24, the nurse practitioner caring for Susan noted that Susan was feeling well. The nurse's notes further stated that Susan had a good weekend and that she was currently alert and oriented as she visited with her husband. The following day, March 25, was the day Susan signed the quitclaim deed to her Hot Springs home and the power of attorney. Though her medical records for March 25 indicate improved mental status, they also reveal Susan was experiencing low oxygen saturation levels and

"require[d] almost total care[.]" During this time, the medical records indicate Susan was experiencing significant "somulence"[4] and was unresponsive.

[¶14.]    In early April 2014, Susan was also experiencing delirium while at Fall River Health and was transferred to a facility in Crawford, Nebraska. In her discharge report from Fall River Health on April 10, her doctor wrote:

> The patient's stay is most notable for altered levels of consciousness. At times she would be slightly appropriate and able to talk with us. And at times she would have one to two days where she was almost noncoherent. She did better with the feeds with the husband present. She would go through levels of delirium at times.[5]

[¶15.]    After her release from the Crawford facility, Susan returned home to live with Ken in Hot Springs. Ken hired caregivers and home health workers and paid any bills relating to Susan's treatment and care. Ken and Susan resumed hosting bridge club at their home. One of Susan's friends indicated in an affidavit that Susan maintained her "cognitive behavior" even as her physical health deteriorated, though the statement does not relate to a specific time period.

---

4.    Though reported as "somulence" in the medical records, the context and the explanation of Susan's attending physician during his deposition causes us to believe the records meant to use the word "somnolence," which describes an inclination to sleep.

5.    On April 6, 2014, Susan's medical records indicated significant confusion:

> Pt remembers her maiden name only. Says she was married for 14 years and divorced. Says she is not married and that she is getting remarried to her prior husband tomorrow. She does not know where she is. She thinks today is february [sic] . . . . Pt. markedly confused today and goes off on tangenual [sic] stories that have no point.

[¶16.]     Susan passed away on April 12, 2016. Ken provided an inventory of the household goods to Gus who was appointed to serve as the personal representative of Susan's estate (the Estate). Ken also gave Susan's nephew the car that Susan had devised to him and transferred to the Estate all accounts and funds owned by Susan or held by the Susan J. Markve Trust. Ken did retain Susan's wedding ring but offered to give the ring to Susan's niece after he passed, though Ken states she declined this offer.

[¶17.]     Gus commenced this action on behalf of the Estate in May 2018, alleging Susan lacked capacity to execute the quitclaim deed to her Hot Springs house and the power of attorney naming Ken as her agent. Gus sought the imposition of an implied trust and further alleged claims of undue influence, conversion, breach of fiduciary duty, statutory fraud, and common law fraud.

[¶18.]     Ken filed a motion seeking summary judgment on all of the Estate's claims in April 2020. The Estate opposed the motion and argued initially that additional time was necessary to allow for the completion of a forensic accountant's report regarding Ken's administration of Susan's bank and investment accounts. The circuit court allowed the Estate additional time, and the report was completed in August by certified public accountant Nina Braun.

[¶19.]     In her report, Braun stated that she was engaged to determine if Susan's separate funds, "per the prenuptial agreement . . . less reasonable cost[s] [for] shared living expenses and the reasonable cost for medical care and assistance have been accounted for." Among the information Braun reviewed was account information relating to several bank and investment accounts along with a "[l]isting

of cost of care and home health costs as prepared by Kenneth Markve." Braun noted she was unable to "tie all of the payments [for health care expenses] . . . to bank statements." She allowed for the possibility that many of the expenses had been paid in cash.

[¶20.]     In addition, Braun was not able to find evidence that the liquidating disbursement for the Markves' joint account at Black Hills Federal Credit Union "was shared." Braun noted a number of transfers from Susan's accounts to the Black Hills Federal Credit Union account and another shared account, accompanied by a number of cash withdrawals. Ultimately, Braun concluded that Susan's accounts "were depleted beyond her costs required for her support estimated in the amount of approximately $415,679."

[¶21.]     While Braun's report was pending, the Estate's attorney withdrew, citing a "material and irretrievable breakdown of the attorney-client relationship." The Estate then retained its current attorney who filed a motion to compel supplemental answers to interrogatories. Among the topics covered by the unanswered interrogatories were details of Hagg's representation, including the circumstances of his engagement, any discussions with Susan about her estate plan and trust arrangement, and discussions about Ken's management of Susan's financial affairs. For each of these inquiries, Ken invoked the attorney-client privilege.

[¶22.]     The circuit court conducted a status hearing on October 6, 2020. Ken's attorney expressed the view that the court should proceed to determine his summary judgment motion filed on April 10. Substitute counsel for the Estate,

however, opposed a decision on the pending motion because, in his view, discovery had not yet been completed. In addition to the pending motion to compel, counsel for the Estate stated that he had not yet deposed Ken. The court allowed the Estate to file an affidavit pursuant to SDCL 15-6-56(f) (Rule 56(f)) and instructed counsel that the affidavit should "state exactly what it is that you need from the deposition of Mr. Markve that prevents you from fully responding to the motion for summary judgment."

[¶23.] The Estate filed its Rule 56(f) affidavit on October 9, 2020. In it, the Estate summarized the course of the discovery to date, including a description of Braun's report.[6] The Estate also included a recently executed affidavit from Rapid City psychiatrist, Stephen Manlove, M.D. In his affidavit, Dr. Manlove stated that he had reviewed Susan's medical records and was "inclined to agree" with an April 6, 2014 assessment by Susan's treating physician, indicating that Susan's delirium was likely chronic. Dr. Manlove stopped short of rendering a medical opinion concerning Susan's capacity without reviewing additional information, but he provisionally opined that Susan's medical records indicated she "had a disability that significantly interfered with her ability to make responsible decisions regarding healthcare, food, clothing, shelter, or finances in the time frame of March of 2014."

[¶24.] At an October 27, 2020 hearing, the circuit court granted, in part, the Estate's motion to compel by directing Ken to provide responses to the questions

---

6. Braun's report is dated August 20, 2020, but it apparently was not shared with Ken's counsel until the Estate attached it to the Rule 56(f) affidavit on October 9, 2020.

relating to Hagg's representation around the time Susan executed the quitclaim deed to her Hot Springs house and the general power of attorney appointing Ken to be her agent. However, the court was inclined to proceed with determining the pending summary judgment motion after allowing the parties an opportunity to submit supplemental briefs addressing the conclusions in Braun's report and any relevant information that might be contained in Ken's supplemental discovery responses.

[¶25.] After receiving a supplemental response brief from Ken, the circuit court granted Ken's motion for summary judgment. In its memorandum opinion and order, the court concluded there was "no factual basis which supports [the Estate's] undue influence claim[.]" The court determined that Hagg's affidavit indicating "Susan was competent" dispositively resolved the question of undue influence. Though the court acknowledged that the deposition testimony of Susan's treating physician and a nurse practitioner who cared for her "provide conflicting accounts of Susan's competency on March 25, 2014[,]" the court reasoned that the Estate had not "provide[d] any basis to dispute attorney Hagg's personal observations while meeting with Susan in regard to drafting the quitclaim deed and power of attorney."

[¶26.] The circuit court also determined that the Estate could not sustain its breach of fiduciary duty claim as it related to the allegation that Ken had improperly dissipated or converted Susan's money and had sold a coin collection of Susan's below its market value. The court concluded that the fiduciary duty claim was supported only by bare assertions that Ken comingled Susan's money with his

own. The court acknowledged Braun's forensic accounting report and concluded that the indeterminate cash withdrawals referenced in the report were explained by Ken's written statement indicating the amounts paid for Susan's care. For similar reasons, the court rejected the Estate's claim that Ken had converted Susan's money. The court did not address Braun's broader opinion that over $400,000 of Susan's money was unaccounted for.[7]

[¶27.] The circuit court also rejected the Estate's fraud claims. It concluded that the statutory fraud claim based upon SDCL 55-2-1 to -6 applied only to trustees, and the undisputed facts indicated Ken was not a trustee. The Estate's common law fraud claim was also unsustainable, in the court's view, because there was no evidence that Ken had made a false representation to Susan or that she relied upon any such statement. Given its conclusion that Ken had not obtained any of Susan's property wrongfully under any of the Estate's theories, the court declined to impose an implied or constructive trust.

[¶28.] The Estate has appealed, arguing that the circuit court overlooked disputed issues of material fact concerning Susan's capacity. Citing additional disputed issues of fact, the Estate also claims the court erroneously granted summary judgment on the Estate's claims of undue influence, breach of fiduciary duty, conversion, fraud, and its request seeking the imposition of an implied trust.

---

7.     As for the coin collection, the circuit court decided that Ken's decision to sell it for $1,401 did not, itself, support a claim he breached his fiduciary duty because there was no evidence that it was sold "below market value."

## Standard of Review

[¶29.] "We review a circuit court's entry of summary judgment under the de novo standard of review." *Harvieux v. Progressive N. Ins. Co.*, 2018 S.D. 52, ¶ 9, 915 N.W.2d 697, 700 (quoting *Wyman v. Bruckner*, 2018 S.D. 17, ¶ 9, 908 N.W.2d 170, 174). We also review de novo questions involving the interpretation of statutes, rules, and contracts, all of which present legal issues. *See Moss v. Guttormson*, 1996 S.D. 76, ¶ 10, 551 N.W.2d 14, 17 (stating that "[q]uestions of law such as statutory interpretation are reviewed by the Court de novo"); *In re Black Hills Power, Inc.*, 2016 S.D. 92, ¶ 8, 889 N.W.2d 621, 633 (stating that rules are interpreted de novo); *Coffey v. Coffey*, 2016 S.D. 96, ¶ 7, 888 N.W.2d 805, 808 (stating that "[c]ontract interpretation is a question of law reviewed de novo"). In the end, "[s]ummary judgment is properly granted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Estate of Lien v. Pete Lien & Sons, Inc.*, 2007 S.D. 100, ¶ 9, 740 N.W.2d 115, 119 (quoting SDCL 15-6-56(c)).

## Analysis and Decision

### *Susan's Capacity*

[¶30.] A person's capacity is essential to her ability to contract or devise her property. Agreements, wills, and transfers of property undertaken without capacity are void. *In re Estate of Perry*, 1998 S.D. 85, ¶ 28, 582 N.W.2d 29, 35; *First State Bank of Sinai v. Hyland*, 399 N.W.2d 894, 896 (S.D. 1987). The standards by which capacity is assessed are different for contracting parties as compared to those

wishing to dispose of their property in anticipation of death. Here, we believe both standards are implicated.

[¶31.] For the Estate's claim that Susan lacked capacity to name Ken as her agent, we agree with the parties' view that SDCL 20-11A-1 expresses the correct rule. "A person entirely without understanding has no power to make a contract of any kind . . . ." SDCL 20-11A-1; s*ee also* SDCL 59-2-1 ("Any person with capacity to contract may create an agency and confer authority on any other person to do any act which he might do . . . ."). We have interpreted the phrase "entirely without understanding" to mean that "the person contracting did not possess the mental dexterity required to comprehend the nature and ultimate effect of the transaction in which [she] was involved." *Hyland*, 399 N.W.2d at 896–97 (citing *Fischer v. Gorman*, 65 S.D. 453, 458–60, 274 N.W. 866, 870 (1937)). The critical "inquiry must always focus on the person's mental acuity and understanding of the transaction at the time contracting occurred." *Id.* (citing *Fischer*, 65 S.D. at 459, 274 N.W. at 869–70).

[¶32.] However, the Estate's additional claim that Susan lacked capacity to convey ownership of the Hot Springs house requires a different standard because the circumstances establish that the transfer came amid Susan's treatment for incurable brain cancer. We have held, in this regard, that lifetime real estate gifts "are testamentary in nature when the record indicates that they were executed 'with a mind toward disposition of the real property following [the testator's]

death.'" *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 26, 790 N.W.2d 52, 62 (alteration in original) (quoting *In re Estate of Pringle*, 2008 S.D. 38, ¶ 24, 751 N.W.2d 277, 285).[8]

[¶33.]    Our cases describe testamentary capacity in the following terms:

> Testamentary capacity and competence evincing the soundness of mind required to make a will are demonstrated when, without prompting, one is able to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty, and the disposition that he desires to make of [his] property. Testamentary capacity and competence [ ] does not require that one have the intellectual vigor of youth or perfect health. Moreover, it is not necessary that a person desiring to make a will have the capacity to make contracts and do business. One may lack competency, such that in the view of medical science he is not of sound mind and memory, yet still retain the requisite competency to execute a will. Testamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the will is executed.

*Id.* ¶ 27 (cleaned up); *see also* SDCL 29A-2-501 ("An individual eighteen or more years of age who is of sound mind may make a will.").[9]

---

8.    The parties do not make this distinction and appear to agree that the capacity to contract standard is the only one that applies here.

9.    The circuit court did not separately address Susan's capacity, but rather considered the related concept of Susan's competency in the context of her susceptibility to undue influence. We believe the issue of capacity requires distinct consideration. As noted by Professor Thomas E. Simmons in the context of testamentary capacity:

> Testamentary capacity precedes an analysis of . . . undue influence . . .; it considers whether the individual had the capacity to understand the nature and extent of his property, to know the natural objects of his bounty, and to form an intent regarding the disposition of his property at death. . . . The doctrine of undue influence considers whether one or more provisions of a will should fail on account of a wrongdoer's interference with the testator's estate plan.

(continued . . .)

[¶34.] Though the capacity to contract and testamentary capacity are different, resolution of the summary judgment issue before us does not require a critical comparison. Both standards require fact-intensive inquiries regarding Susan's cognition that are very much disputed by the parties and the evidence contained in the record. This evidence, when viewed in the light most favorable to the Estate, supports the reasonable inference that Susan lacked the capacity to contract and to devise her property.

[¶35.] In this regard, there is evidence that as Susan suffered from the effects of glioblastoma, she experienced episodic and significant cognitive lapses. Information principally from her medical records indicates that those treating Susan noticed she experienced difficulty orienting herself to time and place after her surgery and during her convalescence. In one instance, she believed she was still married to her ex-husband, and in another incorrectly thought her brother, Gus, was dead.

[¶36.] Susan's medical records while at the Fall River Health swing bed facility indicate she suffered from delirium and experienced periods of somnolence during which she was simply unresponsive. Though he could not make a conclusive diagnosis, Dr. Manlove credited the assessment of Susan's treating physician that her delirium was likely chronic, adding that delirium "is defined as a serious disturbance in metal [sic] abilities that result in confused thinking and reduced awareness of the environment." In Dr. Manlove's view, "a patient suffering from

---

(. . . continued)

Thomas E. Simmons, *Testamentary Incapacity, Undue Influence, and Insane Delusions*, 60 S.D. L. Rev. 175, 179–80 (2015).

delirium would not have the cognitive abilities necessary to make decisions involving the transfer of significant items of property and appointment of a legal agent."

[¶37.]     When viewed with the entirety of the record, Hagg's conclusory opinion concerning Susan's capacity does not resolve the question—it illustrates the disputed and uncertain nature of the issue.  Hagg's bare claim that Susan knew what she wanted to do and was competent cannot serve as the conclusive view of Susan's capacity simply because he was with her when she executed the quitclaim deed and appointed Ken as her agent.  This is particularly true for the quitclaim deed because, as indicated above, "[t]estamentary capacity is not determined by any single moment in time, but must be considered as to the condition of the testator's mind a reasonable length of time before and after the [testamentary disposition]." *Stockwell*, 2010 S.D. 79, ¶ 27, 790 N.W.2d at 62.

[¶38.]     As it relates to the power of attorney, the effect of Hagg's testimony arguably presents a closer question because the capacity to contract inquiry focuses on the time at which Susan appointed Ken to be her agent.  But still, the inferences of incapacity drawn from the medical evidence around and including the March 25 date on which Susan executed the power of attorney are reasonable.  The conflict between Hagg's testimony and the expert medical evidence involve questions of relative weight that are ill-suited for summary judgment.

[¶39.]     For similar reasons, we cannot accept Ken's additional argument that Susan never expressed any regret after executing the power of attorney and deed until her death approximately two years later.  Ken also attempts to support his

claim that Susan's capacity to act is undisputed by pointing to the affidavits of friends who observed Ken and Susan. But this evidence simply adds to the quantum of evidence upon which Ken relies; it does not eliminate the disputed nature of the capacity question itself. Indeed, our well-settled rules for determining summary judgment prohibit us from focusing parochially on Ken's evidence and, instead, require us to credit the evidence offered by the Estate, as the non-moving party, and any reasonable inferences it supports. To do otherwise would require us to weigh the conflicting evidence—a practice which is, of course, categorically proscribed for courts considering motions for summary judgment.

[¶40.]     The question of Susan's capacity permeates this case. It is unquestionably material and just as conspicuously disputed. The circuit court should have denied Ken's motion for summary judgment on this claim.

### *Undue Influence*

[¶41.]     "Undue influence is [the] unfair persuasion of a party who is under the domination of the person exercising the persuasion[.]" *Schaefer v. Sioux Spine & Sport, Prof. LLC*, 2018 S.D. 5, ¶ 11, 906 N.W.2d 427, 432 (quoting Restatement (Second) of Contracts § 177, cmt. A (1981)). "A party to a contract may rescind the same . . . [i]f consent of the party rescinding . . . was . . . obtained through . . . undue influence[.]" SDCL 53-11-2(1). A person may unduly influence another by "taking an unfair advantage of [the person's] weakness of mind[.]" SDCL 53-4-7(2). As we have explained:

> Influence, to be undue, must be of such character as to destroy the free agency of the [consenting party] and substitute the will of another person for [her] own. Its essential elements are (1) a person susceptible to such influence, (2) opportunity to exert

such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result clearly showing the effect of such influence.

*In re Estate of Metz*, 78 S.D. 212, 214–15, 100 N.W.2d 393, 394 (1960).

[¶42.] "A presumption of undue influence arises 'when there is a confidential relationship between the testator and a beneficiary who actively participates in preparation and execution of the will and unduly profits therefrom.'" *Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289 (quoting *In re Estate of Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d 487, 495); *Estate of Gaaskjolen*, 2020 S.D. 17, ¶ 21, 941 N.W.2d 808, 814. Although "[t]he existence of a confidential relationship is [generally] a question of fact rather than law[,]"*Delany v. Delany*, 402 N.W.2d 701, 705 (S.D. 1987), under our decisional law, a confidential relationship exists *as a matter of law* between Ken and Susan because they were husband and wife. *See Jeffries v. Jeffries*, 434 N.W.2d 585, 587–88 (S.D. 1989); SDCL 25-2-10.

[¶43.] Consequently, the burden of going forward with the evidence at trial would shift to Ken to prove "he took no unfair advantage of the decedent." *Dokken*, 2000 S.D. 9, ¶ 28, 604 N.W.2d at 495.[10] However, the ultimate burden of proving undue influence remains with the Estate. *See Pringle*, 2008 S.D. 38, ¶ 39, 751 N.W.2d at 289. Therefore, we must determine whether there are disputed material facts in the record precluding summary judgment on this question.

[¶44.] We have observed that "[b]y their very nature, claims of undue influence are fact intensive inquiries." *In re Estate of Tank*, 2020 S.D. 2, ¶ 48, 938

---

10. We have applied these rules in cases involving traditional will contests as well as specific challenges to lifetime transfers. *See Stockwell*, 2010 S.D. 79, ¶ 31, 790 N.W.2d at 63.

N.W.2d 449, 462. The extent to which Ken actively participated in preparing the quitclaim deed and the general power of attorney is unclear, but the circumstances, when viewed in the light most favorable to the Estate, could support a finding that he had the opportunity to exert influence over Susan.

[¶45.]    As to whether Ken was disposed to influence Susan for a wrongful purpose and whether the transfer of her property was the result of his influence, we note that a separate provision of the prenuptial agreement supports a reasonable inference that Susan may well have intended to keep her house as her separate property, even though it served as the couple's home. At the time Ken and Susan executed the prenuptial agreement, Susan owned a home in Rapid City, and the agreement provided that it "would remain her separate property" and that "the parties plan to maintain such property as their principal residence." The fact that the parties changed their plan at some point and decided to live in Hot Springs may not have changed Susan's desire to maintain the home she purchased through her living trust as her separate property, as she had originally contemplated for the Rapid City home.[11]

[¶46.]    Further, Ken's arguments regarding Susan's ultimate intent when she executed the quitclaim deed to the Hot Springs home on March 25, 2014, are not helpful to our summary judgment analysis. The plain fact that Susan intended for Ken to remain in the Hot Springs house after her death, even if it were undisputed,

_____

11.    Susan's schedule of assets indicates the Rapid City home was a condominium unit valued at $200,000. The record does not reveal whether she retained her home in Rapid City or sold it.

does not foreclose the reasonable possibility that she expected him to expend his separate resources to pay for his interest in the home.

[¶47.] The facts contained in the record also support the inference that Ken played a large, if not determinative, role in selecting Hagg to draft the deed and power of attorney. The record indicates Ken did not want to use the services of Susan's previous estate planning attorney, at least in part, because Ken believed that Susan's previous attorney held an adverse opinion of him. Complicating matters is the apparent secrecy surrounding Ken's relationship with Hagg and Hagg's advice. Ken refused to answer the Estate's interrogatories seeking this information, asserting an attorney-client privilege.[12] Although the circuit court ordered Ken to furnish the information, the Estate filed its final brief regarding Ken's summary judgment motion before the compelled responses were due.

[¶48.] Beyond this, other disputed material facts concerning the other elements of undue influence would also preclude summary judgment regardless of whether Ken rebuts the presumption of undue influence. In this regard, the uncertainty surrounding Susan's mental state also impacts the determination of her susceptibility to influence. We have observed that "[s]usceptibility to influence does not mean mental or testamentary incapacity[,]" because "the application of undue influence presupposes mental competency." *Metz*, 78 S.D. 212, 100 N.W.2d at 398. Therefore, as indicated above, the dispute as to Susan's capacity is material for the undue influence claim as well.

---

12. Hagg filed a notice of appearance stating he represented Ken in Susan's informal probate action.

[¶49.] Also, viewing the evidence in the light most favorable to the Estate, a court could not state with certainty that Ken lacked the opportunity to exert influence over Susan. He was her spouse and in close contact with her even when she was hospitalized and in a transitional facility, and there is evidence to indicate that he isolated Susan from Gus who had previously been skeptical of Ken.[13]

[¶50.] Finally, we do not believe the circuit court could have determined as a matter of law that Susan's decision to effectively give her home to Ken reflected a proper disposition that was not the result of undue influence. As indicated above, there is evidence that Susan and Ken intended to keep their accumulated premarital wealth separate, to some extent. Though their prenuptial agreement allowed either spouse to transfer or gift property to the other, they were not required to or expected to do so.

[¶51.] In the end, Ken's effort to parse the factual record and emphasize favorable facts to the exclusion of adverse ones is strained and inconsistent with our standard for determining motions for summary judgment. Perhaps most telling is Ken's reliance upon our decision in *Smid v. Smid*, 2008 S.D. 82, 756 N.W.2d 1, which he argues is factually aligned with this case. Whatever factual similarities Ken believes exist, *Smid* is inapposite for the simple reason that our decision to uphold a circuit court's finding of no undue influence followed a two-day trial and involved our review of the court's factual findings under our deferential clearly

---

13. Ken asserts that any absence from Gus is attributable to Gus's disruptive behavior while Susan was hospitalized, but determining which party bears the greater responsibility is not possible when determining a summary judgment motion because it requires the court to impermissibly weigh evidence.

erroneous standard. *See id.* ¶ 11, 756 N.W.2d at 5–6 (stating the clearly erroneous standard of review); *see also id.* ¶ 16, 756 N.W.2d at 7 ("[T]he circuit court conducted a two-day bench trial . . . ."); *accord Gaaskjolen*, 2020 S.D. 17, ¶ 17, 941 N.W.2d at 813 (affirming the circuit court's determination of undue influence following a five-day trial).

**Fraud**

### (1) Statutory fraud

[¶52.] The Estate's claim that Ken committed statutory fraud prohibited by SDCL 55-2-1 to -7 is unsustainable. Though these statutory provisions describe certain prohibited acts as "a fraud," they apply only to a trustee who deals with a trust beneficiary. *See* SDCL 55-2-7 (stating "[e]very violation of the provisions of §§ 55-2-1 to 55-2-6, inclusive, is a fraud against the beneficiary of the trust"). The only trust at issue in this case is Susan's living trust, but there is no indication Ken served as a trustee.

[¶53.] Chapter 55-2 does not provide for a definition of trustee, but SDCL 55-1-12 provides that "[t]he person whose confidence creates a trust is called the trustor; the person in whom the confidence is reposed is called the trustee; and the person for whose benefit the trust is created is called the beneficiary." Black's Law Dictionary states that "[u]nder trust law, the trustee generally holds legal title to the trust's property." *Black's Law Dictionary* (11th ed. 2019).[14]

---

14.  Ken cites as controlling the definition of "trustee" in SDCL 55-1A-2, which he states defines a trustee as a person "acting as an original, substitute, added, or successor trustee of a testamentary or inter vivos trust, whichever in a particular case is appropriate." By its terms, the definition is limited in its

(continued . . .)

[¶54.]    The Estate appears to argue that Ken is a trustee by virtue of an implied or constructive trust, not yet imposed upon him. *See* SDCL 55-1-8 ("[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act, is . . . an implied trustee of the thing gained for the benefit of the person who would otherwise have had it."). In other words, the Estate seeks to apply a prohibition *against* statutory fraud to a purported trustee of an implied trust whose status would be conferred *because* he committed fraud or undue influence. The Estate's cursory argument has not illuminated a path out of this circular analysis and is otherwise unsupported by any authority. Under the circumstances, we believe the circuit court correctly granted Ken's motion as to this claim.

### (2) Common law fraud

[¶55.]    The Estate's common law fraud claim is also unmeritorious. We have held that "[f]raud requires proof of three elements." *Aqreva, LLC v. Eide Bailly, LLP*, 2020 S.D. 59, ¶ 56, 950 N.W.2d 774, 791. "First, the representation at issue must be 'made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made[.]'" *Id.* "Second, the representation must have been 'made with intent to deceive and for the purpose of inducing the other party to act upon it[.]'" *Id.* Third, "the person to whom the representation [was] made must demonstrate 'that he did in fact rely on it and was induced thereby to act to his injury or damage.'" *Id.*

---

(. . . continued)
     use to chapter 55-1A, but it would be unavailing in any event because Ken
     was never the "trustee of a testamentary or inter vivos trust."

[¶56.] "To avoid summary judgment, 'the essential elements' of fraud must be 'adequately supported by alleged facts.'" *Id.* (quoting *Ehresmann v. Muth*, 2008 S.D. 103, ¶ 22, 757 N.W.2d 402, 406). Additionally, "averments of fraud must be stated with particularity." *Chem-Age Indus. v. Glover*, 2002 S.D. 122, ¶ 16, 652 N.W.2d 756, 765 (citing SDCL 15-6-9(b)).

[¶57.] Here, there is no evidence to satisfy the elements of common law fraud. The Estate does not identify a false statement made by Ken to Susan, much less facts demonstrating an intent to deceive and reliance.

[¶58.] The Estate argues that its other allegations of wrongdoing also establish that "a reasonable fact finder could conclude that the power of attorney, quitclaim deed, or other subsequent transactions was the result of fraud committed by [Ken] as a 'trustee' or under the common law." However, this broad assertion overlooks the legal requirements for establishing fraud, and we conclude that the circuit court did not err by granting summary judgment on this claim.

***Conversion***

[¶59.] "Conversion is the unauthorized exercise of control or dominion over personal property in a way that repudiates an owner's right in the property or in a manner inconsistent with such right." *First Am. Bank & Trust, N.A. v. Farmers State Bank of Canton*, 2008 S.D. 83, ¶ 38, 756 N.W.2d 19, 31 (quoting *Chem-Age Indus.*, 2002 S.D. 122, ¶ 20, 652 N.W.2d at 766). A plaintiff claiming conversion must prove:

> (1) [plaintiff] owned or had a possessory interest in the property;
> (2) [plaintiff's] interest in the property was greater than
> [defendant's]; (3) [defendant] exercised dominion or control over
> or seriously interfered with [plaintiff's] interest in the property;

and (4) such conduct deprived [plaintiff] of [his or her] interest in the property.

*Id.*

[¶60.]    "Intent or purpose to do a wrong is not a necessary element of proof to establish conversion." *Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 271 (S.D. 1986).  Thus, the foundation for a conversion action "rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results." *Chem-Age Indus.*, 2002 S.D. 122, ¶ 20, 652 N.W.2d at 766 (quoting *Rensch*, 393 N.W.2d 269 at 271).

[¶61.]    In addition to the claim that Ken used his position as Susan's agent to wrongfully assert control over money from her separate accounts, the Estate also alleges Ken interfered with Susan's ownership in her wedding ring, her household goods, and her coin collection.  We address these in turn.

[¶62.]    Whether and to what extent Ken may have converted Susan's money or investments involve disputed issues of material facts.  Forensic accountant Nina Braun opined that the amount of money Ken claimed to have spent for Susan's care exceeded the estimated costs by $415,679.  Braun also concluded that Ken's management of Susan's assets featured a number of transfers from Susan's individual accounts to the couple's joint accounts from which Braun noted unexplained cash withdrawals.

[¶63.]    Still too, there is Braun's determination that Ken closed a joint account by transferring approximately $50,000 over the course of a week in April 2016 to his own individual account, after Susan had passed away.  In Braun's view, "it appear[ed] the balance in the account came from Susan Marvke's [sic] personal

accounts, as such the remaining balance in the account should be transferred to Susan's estate."

[¶64.] Whether these discrepancies in the administration of Susan's assets amount to conversion or, as Ken asserts, can be resolved through his explanations, illustrates the unsuitability of this conversion claim for summary judgment. The circuit court accepted that Ken's accounting of his expenditures disposed of the issues identified in Braun's report. However, relating the information Ken produced to Braun's concerns is no simple task because they are not so easily reconciled. Perhaps if it were otherwise, and Braun had issued an opinion that turned on a single piece of missing information that Ken furnished at some point, a court may have been able to correlate the two and conclude there was no issue of disputed fact as to that topic. But that is not the case here.

[¶65.] The information concerning Susan's cash and equity assets involves several accounts, and the expenditures for her care involve many payments, apparently made in cash, to different people and entities. Ken may prevail at trial, or not, but in either event, the claims that he converted Susan's separate money should be subjected to the adversarial process to allow a fact finder to assess the strength of the evidence and the credibility of the witnesses.

[¶66.] We also believe questions of fact preclude summary judgment as to Susan's ring. For her wedding ring, Susan used a diamond ring she already owned to which a wedding band, furnished by Ken, was attached. Viewing the facts in the light most favorable to the Estate, we will indulge the inference that the diamond ring was at least initially Susan's separate property. This view is consistent with

the schedule of Susan's separate property attached to the parties' prenuptial agreement, listing as a general category "jewelry," which she valued at $100,000. It is reasonable to infer that the ring remained Susan's during the course of the marriage, and there is no indication she gifted it to Ken or allowed for it to be his upon her death. Simply put, Ken's ownership of the wedding ring is not undisputed, and he cannot demonstrate his claim to it as a matter of law.

[¶67.] We have a different view about the remaining conversion claims. The Estate has not demonstrated a genuine issue of material fact to support a claim that Ken converted the household property that belonged to Susan. Ken provided an inventory of Susan's items to the Estate and also turned over her property to the Estate. In addition, Ken allowed Susan's nephew to retrieve a car devised to him in Susan's will. Ken indicates, without a contrary claim, that Susan's nephew declined Ken's offer to take additional personal property belonging to Susan. In our view, the Estate's unspecified conversion claim as to this class of property fails to raise an issue of disputed material fact.

[¶68.] The same is true for the Estate's claim that Ken converted Susan's coin collection. It appears the coin collection was sold during the two years before Susan's death. The proceeds were subsequently placed in Susan and Ken's joint Wells Fargo account, and this account was provided to the Estate following Susan's death.

[¶69.] The Estate's claim is based upon the fact that Ken obtained about $1,500 for the collection, which Susan had, at some earlier point, valued at $7,500. Other than noting this difference, however, the Estate has not provided specific

information that would support the existence of disputed material facts. Perhaps sensing this void, the Estate has attempted on appeal to demonstrate that the value of the coins did, in fact, exceed $1,500 using an online source to support a higher value. However, this source was never used to support the claim before the circuit court, and the Estate cannot unilaterally augment the evidentiary record on appeal in this way.[15]

***Fiduciary Duty***

[¶70.]    A fiduciary relationship arises "whenever a power of attorney is created." *In re Estate of Duebendorfer*, 2006 S.D. 79, ¶ 26, 721 N.W.2d 438, 445. "A fiduciary is defined as '[a] person who is required to act for the benefit of another person on all matters within the scope of their relationship." *Dykstra v. Page Holding Co.*, 2009 S.D. 38, ¶ 27, 766 N.W.2d 491, 497 (emphasis omitted) (quoting *Black's Law Dictionary* (8th ed. 2004)). "Whether a breach of fiduciary duty occurred . . . is a question of fact." *Chem-Age Indus.*, 2002 S.D. 122, ¶ 37, 652 N.W.2d at 772.

[¶71.]    Fiduciaries "may not engage in self-dealing." *Smith Angus Ranch, Inc. v. Hurst*, 2021 S.D. 40, ¶ 16, 962 N.W.2d 626, 630; *see also In re Estate of Stevenson*, 2000 S.D. 24, ¶ 11, 605 N.W.2d 818, 821. As a general rule, "[f]iduciar[ies] must act with utmost good faith and avoid any act of self-dealing that places [their] personal interest in conflict with [their] obligations to the beneficiaries." *Id.* (quoting

---

15.    The Estate also makes an additional argument regarding the coins on appeal, theorizing that a July 2014 check to a coin dealer for a similar amount somehow relates to the coin collection sale in January 2016. Even if the argument had been made to the circuit court, we fail to understand its significance, which the Estate itself does not clearly identify.

*Stevenson*, 2000 S.D. 24, ¶ 9, 605 N.W.2d at 821). We have prohibited self-dealing, even when broad language of a power of attorney document might support a claim of authority to do so. *Wyman*, 2018 S.D. 17, ¶ 22, 908 N.W.2d at 177. Instead we have construed powers of attorney strictly and held that "if the power to self-deal is not specifically articulated in the power of attorney, that power does not exist." *Bienash v. Moller*, 2006 S.D. 78, ¶¶ 13–14, 721 N.W.2d 431, 435.

[¶72.] Ken owed a fiduciary duty to Susan by virtue of the fact that he served as Susan's agent under a general power of attorney. It is equally clear that the power of attorney document did not authorize self-dealing. Although the power of attorney dictates that Ken "may perform for [Susan] and in [Susan's] name and on [Susan's] behalf act in the management, supervision, and care of [Susan's] estate and affairs that [Susan] personally [has] authority to perform[,]" this is not "clear and unmistakable language authorizing" Ken's ability to self-deal. *See Bienash*, 2006 S.D. 78, ¶ 14, 721 N.W.2d at 435 (holding that the power of attorney's authorization to allow the attorney-in-fact to do all the things the principal would "personally have the right to do" did not authorize self-dealing).

[¶73.] As a result, there are disputed questions of material fact regarding whether or not Ken engaged in self-dealing when he handled Susan's finances. In her forensic accounting report, Braun noted that "substantial" cash transactions between Ken and Susan's accounts were "unusual in nature and not supported with documentation for the use of the cash." Additionally, Braun opined that "Susan Marvke's [sic] accounts were depleted beyond her costs required for support estimated in the amount of approximately $415,679." These questions of fact

should have precluded summary judgment on the Estate's breach of fiduciary duty claim.

### Implied Trust

[¶74.]     "An implied trust arises from the facts and circumstances of a transaction." *DFA Dairy Fin. Servs., L.P. v. Lawson Special Trust*, 2010 S.D. 34, ¶ 32, 781 N.W.2d 664, 672 (quoting *Noll v. Brende*, 318 N.W.2d 319, 320 (S.D. 1982)). An implied trust is generally remedial in nature and is an equitable tool used to restore the status quo and to protect assets wrongfully obtained. *Perry*, 1998 S.D. 85, ¶ 28, 582 N.W.2d at 35 (citing *Knock v. Knock*, 80 S.D. 159, 120 N.W.2d 572, 576 (S.D. 1963)); *see also* SDCL 55-1-8. To impose a constructive trust, the wrongful act must be proven by clear and convincing evidence, and must show:

> (1) the constructive trustee gained; (2) that gain was by fraud, accident, mistake, undue influence, violation of a trust, or other wrongful act; (3) the constructive trustee has no superior right to the thing gained; and (4) the party seeking the constructive trust would have otherwise had the thing gained.

*In re Estate of Perkins*, 508 N.W.2d 597, 600 (S.D. 1993) (citing *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 264 (S.D. 1988)).

[¶75.]     Here, the Estate has alleged that a constructive trust is necessary due to the invalidity of the power of attorney and quitclaim deed. However, whether this equitable remedy is appropriate here cannot be determined until a fact finder resolves the claims we have identified above. *See id.* (emphasizing that the constructive trustee must have gained by a wrongful act, including fraud and undue influence, before a constructive trust can be imposed).

*Rule 56(f)*

[¶76.]    Given our disposition on the principal issues largely in favor of the Estate, a remand for further proceedings is necessary.  Therefore, we need not address the Estate's allegation that the circuit court abused its discretion when it considered and ruled on the pending summary judgment motion notwithstanding the Estate's Rule 56(f) motion and the court's order compelling supplemental discovery from Ken.

## Conclusion

[¶77.]    Ken may well believe he has a strong case in his effort to resist the Estate's claims of incapacity, undue influence, conversion, and breach of fiduciary duty, and we express no opinion in this regard.  Suffice it to say that Ken's evidence is not of such a character that it *eliminates* issues of material fact relating to the Estate's claims, particularly when we review the facts in the light most favorable to the Estate.  Neither we, nor the circuit court, can weigh the strength of the parties' evidence, the reasonableness of Ken's actions, or the credibility of any witness as matters of law.  These questions must be submitted to a fact finder.  We affirm in part, reverse in part, and remand for further proceedings.

[¶78.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.